[No. S013187. Aug. 10, 2000.]

THE PEOPLE, Plaintiff and Respondent, v.
RANDY STEVEN KRAFT, Defendant and Appellant.

992

**COUNSEL**

Richard Power and Elizabeth Barranco, under appointments by the Supreme Court, for Defendant and Appellant.

Daniel E. Lungren and Bill Lockyer, Attorneys General, George Williamson, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Keith I. Motley, William M. Wood and Warren P. Robinson, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**WERDEGAR, J.**—An Orange County jury convicted defendant Randy Steven Kraft of the first degree murders of Edward Daniel Moore (count 1), "John Doe Huntington Beach" (count 2), Ronald Gene Wiebe (count 3), Keith Daven Crotwell (count 4), Mark Howard Hall (count 5), Scott Michael Hughes (count 6), Roland Gerald Young (count 7), Richard Allen Keith (count 8), Keith Arthur Klingbeil (count 9), Michael Joseph Inderbieten (count 11), Donald Harold Crisel (count 12), Robert Wyatt Loggins, Jr. (count 13), Eric Herbert Church (count 14), Geoffrey Alan Nelson (count 16), Rodger James DeVaul, Jr. (count 18), and Terry Lee Gambrel (count 19). (Pen. Code, § 187; unless otherwise specified, all statutory references are to the Penal Code.) The jury further convicted defendant of the sodomy of Inderbieten (count 10) (§ 286) and inflicting mayhem on Nelson (count 15) (§ 203). The jury found true an allegation that defendant had personally inflicted great bodily injury in committing sodomy against Inderbieten (§ 12022.7) and the related special-circumstance allegation of murder in the commission of sodomy (§ 190.2, subd. (a)(17)(D)). With respect to counts 6,

7, 8, 9, 11, 12, 13, 14, 16, 18, and 19, the jury also found true special circumstance allegations of multiple murder (§ 190.2, subd. (a)(3)). The jury acquitted defendant of the charge of sodomy against DeVaul (count 17) and the related special-circumstance allegation. The jury subsequently fixed the penalty at death.

The trial court granted defendant's motion to vacate as duplicative 10 of the 11 multiple-murder special-circumstance findings and denied his motion to modify the verdict to life imprisonment without possibility of parole. (§ 190.4, subd. (e).) The court sentenced defendant to death for counts 6, 7, 8, 9, 11, 12, 13, 14, 16, 18, and 19; it further imposed consecutive sentences of 25 years to life in state prison for counts 1, 2, 3, 4, and 5,[1] but stayed service of those sentences pending execution of the death sentence. The court also imposed the middle term of three years for the sodomy conviction in count 10, with a consecutive term of three years for the related great bodily injury enhancement, and the middle term of four years for the mayhem conviction in count 15, and stayed service of the determinate terms pending execution of the death sentence and service of the life sentences. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety.

### I. FACTS

#### A. *Guilt Phase Evidence*

##### 1. *Overview*

Defendant was convicted of murdering 16 young White males between December 1972 and May 1983. Six of the victims were United States Marines. Most were killed by ligature strangulation, and many had ligature marks on their wrists. Defendant sexually mutilated some of the victims, engaged in sexual activity with some of them, and left the bodies of some victims unclothed. Most of the victims had alcohol and prescription drugs (most frequently diazepam, which is sold as Valium) in their systems at the time of death. Defendant left the bodies of most of the victims on or near freeways or other roads. Physical evidence linked defendant to eight of the murders, but with respect to the remainder, the prosecution relied on the similarity of the modus operandi and the existence of the so-called death list—cryptic notebook entries, penned by defendant, that the prosecution asserted represented the various victims.

---

[1]These offenses occurred during a period when California's death penalty law had been declared unconstitutional.

## 2. *Murder of Terry Lee Gambrel*

Around 1:00 a.m. on May 14, 1983, Sergeant Michael Howard and Officer Michael Sterling of the California Highway Patrol, on patrol together near Interstate 5 in the San Juan Capistrano area of Orange County, were driving northbound on the freeway south of Oso Parkway when they saw a car driven by defendant weaving in its lane. The officers pulled defendant over and, after conducting field sobriety tests, arrested him for driving under the influence. (The details of the arrest are discussed *post*, at pages 1037-1038, in connection with defendant's challenge to the search of his car.) Defendant told Sterling his passenger was a hitchhiker. While Sterling was placing defendant in the patrol car, Sergeant Howard knocked on the passenger window of defendant's car in an attempt to rouse the passenger, who appeared to be asleep or passed out. There was no response. Howard, entering the car through the driver's side, discovered the passenger, later identified as Gambrel, had no pulse and was not breathing. Upon lifting a jacket from Gambrel's lap, Howard observed that Gambrel's pants were unbuttoned and pulled down between his waist and his knees so that his penis and testicles were supported by the crotch of the pants. The crotch area was wet. There were indentations on Gambrel's wrists similar to those a wide rubber band would make. A pill vial, labeled Ativan and prescribed for defendant, lay on the floor between the driver's seat and door.

A paramedic summoned to the scene asked defendant if Gambrel had taken any drugs; defendant replied he had given Gambrel some of his Ativan.

The autopsy was performed by Dr. Walter Fischer, who was deceased at the time of trial. Dr. Robert Richards, who reviewed the autopsy photographs and Dr. Fischer's reports and testimony at the preliminary hearing, testified at trial that Gambrel's death resulted from asphyxia due to ligature strangulation. The ligature consisted of a strap that had been tightened around Gambrel's neck. There were also ligature marks on both of Gambrel's wrists. Petechial hemorrhages in the neck organs indicated the killer had repeatedly tightened and loosened the ligature. Autopsy photographs showed a bruise on Gambrel's lip. Gambrel's body apparently was missing shoes and socks when removed from defendant's car.

Toxicological analysis showed Gambrel's blood-alcohol level at the time of his death was 0.067 percent. Also in Gambrel's blood was .07 micrograms per milliliter of lorazepam, an anti-anxiety drug sold under the trade name Ativan. Toxicologist Raymond Kelly testified those levels of alcohol and lorazepam would tend to make a person sleepy, confused and uncoordinated.

Gambrel was 25 years old at the time of his death and was a United States Marine stationed at El Toro. He stood six feet one inch in height and weighed about 200 pounds.[2] Gambrel was engaged to be married. He was last seen alive on May 13, 1983; around 9:00 p.m., when he told his roommate he needed to find a ride and mentioned something about a party at a friend's house. Marine Sergeant Ronald Phillips had invited Gambrel to a housewarming party set for May 13, 1983, but Gambrel did not attend despite having said he intended to do so. Handwritten directions to the party were found in Gambrel's wallet after his death.

### 3. *Murder and Mayhem of Geoffrey Alan Nelson*

On the night of Friday, February 11, 1983, between 11:00 and 11:30 p.m., Bryce Wilson saw Geoffrey Alan Nelson and Rodger James DeVaul, Jr., outside Wilson's home in Cypress, Orange County. When Wilson last saw the two, DeVaul was wearing Nelson's jacket. Neither Nelson nor DeVaul had consumed alcohol or drugs before leaving Wilson. About 1:30 a.m. on February 12, 1983, Nelson appeared at Wilson's front door and asked Wilson's mother, Sharon House, if he could speak with Wilson. She was unable to awaken Wilson, however, and Nelson left without speaking to him.

About 5:15 that morning, Officer Donald Batchelder of the Los Angeles Police Department, who was off duty and driving to work, discovered Nelson's nude body on the Euclid Street on-ramp to the Garden Grove Freeway in the City of Garden Grove. As Batchelder got out of his car, he saw Nelson's foot move slightly. Batchelder got back into his car, drove to a telephone and called the local police.

Officer Richard Morales of the Garden Grove Police Department responded to the scene and found the body warm to the touch, although he detected no pulse or respiration. Skid marks on the pavement indicated Nelson's body had been dumped from a moving vehicle. The front of Nelson's neck bore ligature marks, and he had been emasculated.

Dr. Fischer performed the autopsy. After reviewing autopsy photographs and Fischer's notes and preliminary hearing testimony, Dr. Richards concluded Nelson had died as a result of ligature strangulation. There was a ligature mark on the neck consistent with a belt buckle. Nelson's right wrist also bore a ligature mark. Dr. Richards found that Nelson's penis and scrotum had been cut off by some type of sharp-edged instrument. Because the bleeding was "not that great," Richards thought Nelson was "probably

---

[2]The presentence report indicates defendant was five feet 10 inches tall and weighed 160 pounds.

dead" when the injury was inflicted, although the emasculation could have occurred perimortem, or around the time of death. Skid marks and road burns on the body reflected Nelson was dead at the time of those injuries.

Toxicological analysis revealed Nelson's blood-alcohol level to be 0.14 percent at the time of death. Nelson's blood also contained the anti-anxiety drug diazepam, and his stomach contained propranolol, a cardiac drug available only by prescription. Toxicologist Kelly opined the combination of diazepam and alcohol would have "very, very noticeably sedated" Nelson and could have caused him to fall asleep.

Criminalist James White of the Orange County Sheriff's Department compared a fiber found on Nelson's body with the maroon socks of victim Eric Herbert Church, whose body had been found on January 27, 1983. White had only a single fiber and could compare only a longitudinal microscopic view; on that basis he concluded the fibers were consistent in color and diameter.

The defense presented evidence that on February 11, 1983, one of Nelson's friends saw him drinking beer and taking Valium tablets. A friend of defendant's testified defendant had played bridge from about 7:00 p.m. to midnight on February 11, 1983. The next day, defendant worked from 9:00 a.m. to 5:30 p.m. as a computer programmer, on an assignment at St. Ives Laboratory in Palos Verdes. According to a coworker who was also at St. Ives that day, defendant appeared normal, not disheveled or injured, when he arrived for work. The defense also presented testimony by a female impersonator who worked in a gay bar and who believed a photograph of Nelson depicted a man the witness had met in a bar and with whom he had had a sexual relationship. Detective Shave, however, testified the witness's identification of Nelson as that man was mistaken.

At the time of his death, Nelson, a single White male, was 18 years old. He stood five feet nine inches tall and weighed 129 pounds.

### 4. *Murder of Rodger James DeVaul, Jr.*

As noted above, Bryce Wilson saw Rodger James DeVaul, Jr., together with Geoffrey Alan Nelson, outside Wilson's house in Cypress on the evening of February 11, 1983.

About 3:00 p.m. on Sunday, February 13, 1983, a motorist who was driving in the San Bernardino Mountains stopped at a turnout near Glendora Ridge and Mt. Baldy Road. There he saw a dead body lying off the road

down a hillside. Deputy James Davis of the Los Angeles County Sheriff's Department, responding to the scene, observed a body (later identified as that of Rodger James DeVaul, Jr.) about 14 or 15 feet from the side of the road. The victim's pants were unbuttoned and partially pulled down. Sergeant Clinton Dillon, who also responded to the scene, noted that the fine sand on the soles of DeVaul's shoes and his legs and around his penis did not match the sand in the area. DeVaul was wearing Geoffrey Alan Nelson's jacket.

The cause of DeVaul's death was determined to be asphyxia due to neck compression. An abrasion on DeVaul's neck measured one and one-quarter inches in length and one-eighth inch in width. The left wrist bore a mark measuring one inch by one-quarter inch. Anal swabs taken from DeVaul at the autopsy revealed the presence of semen that could not be typed. DeVaul's blood-alcohol level was 0.07 percent, and his blood also contained propranolol and diazepam at therapeutic levels. The combination of alcohol and drugs would have impaired DeVaul's consciousness.

Some of the photographs found underneath the floor mat of defendant's car at the time of his arrest, as well as some of the photographs developed from negatives taken from his house, depicted DeVaul. The photographs variously showed DeVaul's anal area, a ligature on his wrist, and a pose in which DeVaul was holding his penis. Three photographs developed from the negatives sequenced after the DeVaul shots appeared to depict the area around the St. Ives Laboratory, where defendant was working the day after Nelson and DeVaul disappeared.

At the time of his death, DeVaul was 20 years old and single, and had a girlfriend. He stood five feet nine or 10 inches tall and weighed between 160 and 170 pounds.

The defense presented witnesses acquainted with DeVaul who testified he was a drug user. Various members of defendant's family testified that, on the afternoon of February 13, 1983, defendant had attended a birthday party for his father at defendant's sister's house. That morning, defendant had met his niece at a bakery to pick up a birthday cake before proceeding to the party. After leaving the party between 4:00 and 6:00 p.m., defendant drove his niece back to the bakery, where she had left her car.

A defense investigator testified that the distance between the places where DeVaul was last seen alive and where his body was found was 47.7 miles. Between the place where Nelson's body was found and the St. Ives Laboratory was a distance of 25 miles. The defense also presented evidence that

soil samples taken from DeVaul's clothing and the crime scene did not share a common origin with those taken from defendant's car following the arrest. Head hairs taken from the groin area and shirt of DeVaul were different from the hairs of defendant, DeVaul or Nelson.

Prosecution rebuttal evidence included testimony by John McWilliams, who had attended Claremont Men's College with defendant, that defendant was familiar with the mountain area around Mt. Baldy Road and Mt. Baldy Village. Defense surrebuttal evidence included testimony by Mark Gaukler, a friend of DeVaul's, that Gaukler had visited DeVaul sometime in the week before his death; while he waited for DeVaul to come home, several men who looked like "rough characters" had entered the house and gone to DeVaul's bedroom. That night, DeVaul telephoned Gaukler, saying he was in trouble and asking that Gaukler come over. DeVaul's trouble evidently was financial.

The prosecution contended victims Nelson and DeVaul were represented on defendant's death list, found in the trunk of his car, by the entry "2 IN 1 BEACH." The whitish sand caked onto the blood around DeVaul's lips and nostrils was consistent, the prosecution argued, with beach sand. The prosecution theorized defendant met DeVaul and Nelson on the beach after leaving his bridge group.

### 5. *Murder of Eric Herbert Church*

Around 11:00 a.m. on January 27, 1983, a California Department of Transportation worker discovered the dead body of a young man, later identified as Eric Herbert Church, off the shoulder of the on-ramp to the northbound 605 Freeway from Seventh Street in Long Beach. The body was clothed and wore burgundy colored socks but no shoes. It appeared to have skidded to the spot where it was found. Death was estimated to have occurred at least 12 hours before the body was found. The cause of death was asphyxia due to ligature strangulation. Ligature marks were found on the victim's wrists as well as his neck. Church's blood-alcohol level at the time of death was 0.08 percent and his blood also contained 2.5 milligrams per liter of diazepam, a potentially fatal amount that would have put him into a mild to moderate coma.

Using a microscope, infrared spectrophotometry, and thin-layer chromatography, criminalist White determined the fiber in Church's socks to be consistent in color, diameter, shape and dye with three balls of maroon fiber recovered from the front floor of defendant's car following his arrest. White

also compared the fiber in the socks with a single fiber found on the body of victim Geoffrey Nelson and concluded the fibers were consistent in color and diameter. White further compared a photograph of Church's corduroy pants with a photograph, found in defendant's car at the time of his arrest, depicting a person wearing corduroy pants. White concluded that a series of three spots on the left leg of the pants and a loose thread at the corner of the watch pocket, each appearing in both photographs, established a match. White also compared photographs of a belt and a jacket, taken pursuant to search warrant from defendant's garage, with those depicted in the photographs taken from defendant's car, again concluding the items were the same.

Church possessed an electric shaver that his father had repaired by knotting and soldering a wire. Church's father identified a shaver found in the search of defendant's garage as the one he had repaired.

Church, 21 years old at the time of his death, stood five feet eight or nine inches tall and weighed 130 to 140 pounds.

In defense, criminalist John Thornton testified a comparison of soil samples from Church's clothing and the location where his body was found with soil samples taken from defendant's car at the time of his arrest showed that the samples did not share a common origin. A photographic expert opined the person depicted in the photographs taken from defendant's car was not Church. Neither defendant's nor Church's fingerprints were found on the shaver identified by Church's father. Defendant's father also repaired electrical appliances.

6. *Murder of Robert Wyatt Loggins, Jr.*

In August 1980, Robert Wyatt Loggins, Jr., 19 years old, was a United States Marine stationed in Tustin. He stood five feet nine inches tall and weighed between 145 and 150 pounds. On the evening of Friday, August 22, 1980, Loggins left the base with three other Marines to go drinking. The four went to a location off Laguna Canyon Road and drank from a bottle of Southern Comfort. Later, after the group stopped at a liquor store near the Huntington Beach pier, Loggins stated he wanted to spend the night on the beach and walked off, rebuffing his companions' attempts to get him to return to their car. The three men subsequently searched for Loggins at Huntington Beach but did not find him. Loggins did not show up for work the following Monday morning.

On the morning of September 3, 1980, some young boys living near Paseo Sombra in El Toro found a body, later identified as that of Loggins, in a

large green plastic bag in the foothills. A witness walking in the area around 8:00 p.m. on September 1 had seen no bag there at that time. The body was tied in a fetal position with a rope around the ankles and wrists, and with the feet tied near the head. A sheet of clear plastic was wrapped over the body and tied at the neck. The body was nude, and the only article of clothing with the body was a sock near the rectum. The advanced decomposition of the body precluded certainty as to the cause of death; Dr. Peter Yatar, who performed the autopsy, concluded, however, that asphyxia by strangulation or smothering was a possible cause. Postmortem ligature marks were visible on the wrists, neck and ankles, but the pathologist could not determine if antemortem ligature marks were present on the neck. The level of alcohol in the victim's brain was 0.25 percent, while the blood-alcohol level was 0.24 percent, the similarity of those figures suggesting putrefaction did not account for the alcohol levels in the body. Antihistamines (chlorpheniramine and diphenhydramine) were found in various concentrations in the blood and certain organs. The combination of drugs and alcohol could have caused Loggins's death. Loggins had not taken any pills while he was with his fellow Marines on August 22.

Photographs of Loggins were found in defendant's car and in a briefcase found in defendant's house.

Loggins, who, as noted, was a Marine and was last seen alive in Huntington Beach, had several tattoos. The prosecutor argued to the jury that the entry "MC HB Tattoo" on the list found in defendant's car referred to Loggins.

In defense, Loggins's mother testified Loggins had a drinking problem; a friend of Loggins's testified Loggins used all types of drugs. The defense presented evidence that Loggins's friends had moved his car after his disappearance. A resident of the area testified he had, on September 1, 1980, seen a car occupied by a man and a woman stopped at the dead end of the street near where Loggins's body was found, and had seen the man and woman lift something that appeared to be a plastic trash bag out of the back of the car; when the witness returned to the area the next day, he saw a number of trash bags and smelled the odor of something dead. According to pathologist Robert Bucklin, Loggins was alive when the photographs found in defendant's car and house were taken. A professor of pharmacy testified the reported level of chlorpheniramine in Loggins's system must have been incorrect, as it would have required the victim to ingest 351 tablets and at least a gallon of water to reach such a level.

### 7. Murder of Donald Harold Crisel

In June 1979, Donald Harold Crisel, then 20 years old, was a United States Marine stationed in Tustin. He stood five feet 10 or 11 inches tall and weighed 160 or 165 pounds.

Around 1:30 a.m. on June 16, 1979, a fellow Marine saw Crisel walking alone near the Marine base. Crisel said he was going to a restaurant near the base. About 9:30 or 9:45 p.m. that day, a passing motorist saw a body later identified as Crisel's on the side of the Irvine Center on-ramp to the northbound San Diego Freeway in Irvine. A responding police officer testified Crisel had no pulse, but was warm to the touch and bleeding slowly from the nostrils. Crisel was wearing only undershorts, on which there appeared to be tire tracks. The body evidently had been pushed from a moving vehicle, as it bore road burns.

Dr. Richards, who performed the autopsy, determined the cause of death to be multiple drug overdose. Crisel's blood-alcohol level at the time of death was 0.06 percent. Potentially fatal levels of acetaminophen, as well as the antihistamines phenylpropanolamine and phenyltoloxamine, were also in Crisel's blood. The analgesic phenacetin and chlorpheniramine were also present. Postembalming photographs revealed ligature marks, between one-half inch and one inch in width, on the neck. The wrists also bore faint ligature marks. Had the toxicology results been negative, Richards would have found the cause of death to have been ligature strangulation. Crisel's left nipple had been lightly burned with a car cigarette lighter after his death.

The prosecutor argued to the jury that the entry "MARINE DRUNK OVER-NIGHT SHORTS" on defendant's list referred to Crisel, theorizing that defendant encountered Crisel around 1:30 or 2:00 a.m. and kept him overnight until the following evening.

The defense presented evidence that Crisel had a history of alcohol abuse and sinus problems, and that military police had information about other possible suspects in Crisel's murder. A criminalist testified that the type of tire on the car defendant owned at the time Crisel was murdered would not have left the pattern found on the victim's undershorts. Another criminalist testified she examined trace evidence, consisting of a hair, a clothing-type fiber and an animal-type fiber, on the undershorts, but could not link any of them to defendant.

### 8. Murder and Sodomy of Michael Joseph Inderbieten

In November 1978, Michael Joseph Inderbieten, then 21 years old, lived in Long Beach. He stood six feet five inches tall and weighed 160 pounds.

On the evening of Friday, November 17, 1978, Inderbieten went with friends to a nightclub on the Pacific Coast Highway some three to five miles from his home. The driver of Inderbieten's group met a girl at the club and took her home, leaving the group stranded. Another girl agreed to drive Inderbieten and one of his friends home, and they got into her car, which was very full. A girl known as "Cave Woman" sat on Inderbieten's lap. He began to pinch her in "not a very good area," and she slapped him. Inderbieten angrily got out of the car and declared he would walk home. His friends last saw him walking toward the Pacific Coast Highway in the direction of his home.

About 6:15 the following morning, a passing motorist saw a body later identified as Inderbieten's on a transition ramp from Seventh Street leading to the 405 and 605 Freeway on-ramps in Long Beach. The body was dressed only in a pair of pants, which were pulled down, partially exposing his buttocks. The time of death was estimated at 6:00 a.m. The cause of death was determined to be anoxia due to suffocation. Inderbieten's eyes and nipples had been burned with a cigarette lighter. His scrotum and testicles had been removed as well as some skin from the penis. The removal of the testicles probably occurred while Inderbieten was still alive. There was no evidence of injury to the rectum, but the anus appeared to be slightly dilated, according to Dr. Richards, who reviewed Dr. Fischer's autopsy report, photographs and other material. There were ligature marks around both wrists but not the neck. The body bore road burns consistent with having been thrown from a vehicle traveling slowly. Inderbieten's blood-alcohol level at the time of death was 0.16 percent, and a low dosage of diazepam was found in his stomach. Secobarbital was found at a low level in Inderbieten's liver and blood. The combined effect of the alcohol and the secobarbital would have been deep sedation or sleep. Inderbieten consumed only a couple of beers at the nightclub while with his friends.

Anal swabs were collected at the autopsy and, upon analysis, revealed the presence of blood type B spermatozoa and semen, which could have come from either a person with type B blood or a nonsecretor. Inderbieten had type B blood and was a secretor; defendant is a nonsecretor.

Based on the location where the victim's body was found (i.e., near the 405 Freeway), the prosecutor argued to the jury that the entry "DART 405" on defendant's list referred to Inderbieten, although he was unable to assign meaning to the word "DART."

9. *Murder of Keith Arthur Klingbeil*

About 3:30 a.m. on July 6, 1978, a motorist traveling northbound on Interstate 5 between La Paz Road and Oso Parkway discovered a body, later

identified as Keith Arthur Klingbeil, in the slow lane of the freeway. The body was warm when police arrived, death having probably occurred within one-half hour of the finding of the body. The body was clothed and wearing boots missing the left lace. The cause of death was determined to be acetaminophen overdose, with ligature strangulation a contributing factor. On the right side of Klingbeil's neck were ligature lines about three-fourths of an inch apart. There were road burns all over the body consistent with ejection from a moving vehicle. Around the time of death, he had been burned with a car cigarette lighter on the left nipple.

Klingbeil was a 23-year-old resident of Everett, Washington, who stood five feet 10 or 11 inches tall and weighed 150 to 160 pounds. He had hitchhiked from his home to Southern California. Four matchbooks were found in Klingbeil's pants, one of which came from a Chevron station on Lakewood Boulevard in Long Beach.

The prosecutor argued to the jury that the entry "HIKE OUT LB BOOTS" on defendant's list referred to Klingbeil, who, as noted, evidently had recently been in Long Beach and was wearing hiking boots at the time of death.

The defense presented evidence that, near the location where Klingbeil's body was found, Orange County Deputy Sheriff Christopher Leseburg was directed to investigate a Chevrolet pickup truck occupied by a lone male. On rebuttal, however, the prosecution demonstrated that the truck had been stopped around 2:30 or 3:00 a.m. due to an engine problem one-quarter mile short of the location of the body. The defense also showed that sheriff's employees had inadvertently destroyed evidence concerning the Klingbeil investigation.

### 10. *Murder of Richard Allen Keith*

Richard Allen Keith, a 20-year-old United States Marine stationed at Camp Pendleton, stood six feet two or three inches tall and weighed about 190 pounds. On Sunday, June 18, 1978, Keith was visiting at his girlfriend's mother's house near the intersection of Avalon Boulevard and the San Diego Freeway in Carson, Los Angeles County. According to the girlfriend, Keith may have been under the influence of drugs at that time. He left the house around 11:00 p.m. Keith had no car and had hitchhiked to his girlfriend's house.

At 5:15 a.m. the following day, a Los Angeles fireman discovered a nude body, later identified as that of Keith, lying off the side of Moulton Parkway one-half mile north of La Paz Road in Orange County. The body had been

pushed out of a moving vehicle. The cause of death was ligature strangulation. Keith's blood-alcohol level at the time of death was 0.07 percent, and diazepam and flurazepam (a drug similar to, and somewhat more potent than, diazepam) were present in Keith's system in amounts sufficient to have rendered him very sleepy.

The prosecutor argued to the jury that the entry "MARINE CARSON" on defendant's list referred to Keith, who, as noted, was a Marine and was last seen in Carson.

11. *Murder of Roland Gerald Young*

About 8:19 p.m. on Saturday, June 10, 1978, the Orange County Sheriff's Department released Roland Gerald Young from its jail, where he had been confined since his arrest for public drunkenness earlier that day. Young, 23 years of age, stood five feet seven or eight inches tall and weighed 155 to 160 pounds.

About 3:20 the following morning, a passing motorist saw what appeared to be a dead body on Irvine Center Drive in the City of Irvine but, as she was unsure what she had seen, she made no report until a later time. At 4:00 a.m., a Santa Ana firefighter saw Young's body at that location and called police. The responding officer observed the body was shirtless and saw a large amount of blood, still wet, in the crotch area of the pants. Blood on the pavement indicated the body had bounced as it hit the roadway after being ejected from a fast-moving vehicle. The left shoe was missing a lace, and there was no belt on the pants. A jail release form was in one of the pants pockets. The socks and shoes were labeled "LACO," indicating they had been issued by the Los Angeles County jail.

The cause of death was determined to be blood loss following four stab wounds to the chest, all of which entered the heart. At or near the time of death, a sharp knife had been used to cut the scrotal sac and remove one testicle and some skin from the penis. There were also antemortem lacerations over the left eyebrow and left eyelid. A faint mark was present on the back of the right hand and wrist. Young's blood-alcohol level at the time of death was 0.09 percent. There was diazepam in his blood and stomach in nontoxic concentrations. The combined effect of the alcohol and diazepam would have been extreme drowsiness or mild coma.

The prosecutor argued to the jury that the entry "JAIL OUT" on defendant's list referred to Young.

The defense presented evidence that Young was a user of any available type of drug and that, after his release from jail, he telephoned a friend,

seeking a ride home from Santa Ana because he was in trouble with his supplier for using drugs for which he could not pay. Young's belt was not found among the belts taken from defendant's house. Nor did shoelaces taken from defendant's house match the lace in Young's right shoe.

The defense also presented the testimony of Carmen Custer, who, while in custody on a petty theft charge in September 1982, had spoken to police concerning a June 1978 murder. He related that in June 1978 he had taken some prostitutes to a residence on South Birch Street in Santa Ana to buy heroin. The seller told the prostitutes he had stabbed someone the previous night and dumped him off Culver Road near the dump. Custer gave police the information in the hope of obtaining release from jail on his own recognizance.

The manager of the South Birch Street apartment buildings identified by Custer testified that, in June 1978, a heroin dealer did live in the buildings, but not in the specific apartment identified by Custer. That apartment was occupied by an 87-year-old man who did not sell drugs. Custer had been arrested four times between June 1978 and September 1982, but did not give his information to police on those occasions. The dump off of Culver Road mentioned by Custer was "quite a way" from the location where Young's body was found.

The defense also presented evidence that in April 1978 defendant had bailed his friend Wayne Wooden out of jail (implying this was the significance of the "JAIL OUT" entry). On rebuttal, however, Wooden testified defendant never referred to him as "Jail Out"; nicknames were not used for members of their poker and bridge group.

In rebuttal, a criminalist testified he had compared a hair found on Young's pants to a hair sample from defendant's head. His examination showed that physical characteristics (color, thickness, curliness, and root and tip characteristics) and microscopic characteristics (pigmentation distribution) were consistent in the two samples. He could not, however, state definitively that the hair found on Young's pants came from defendant. One of defendant's sisters testified defendant's hair was bleached in the late 1970's.

### 12. *Murder of Scott Michael Hughes*

In April 1978, Scott Michael Hughes, 18 years old, was a United States Marine stationed at Camp Pendleton. He stood five feet 10½ inches tall and weighed 170 to 180 pounds. On Friday, April 14, 1978, Hughes told a fellow

Marine he was going to travel to the State of Washington to visit his brother, who was suffering from cancer.

The following Sunday, around 7:00 a.m., Hughes's dead body was found about four feet from the eastbound on-ramp to the Riverside Freeway in Anaheim at Euclid. There were no laces in Hughes's shoes. The cause of death was found to be cerebral anoxia due to ligature strangulation. Ligature marks, consistent with a belt, appeared on the neck, most prominently on the left side. There were antemortem abrasions to the left temple, left eye, and left side of the chin. Hughes's scrotum had been cut and the left testicle excised, probably after death. There were road burns on the body. No alcohol was present in Hughes's blood, but diazepam was present at about three times the therapeutic level. This would have caused sleepiness and mental confusion.

Trace evidence consisting of fibers was collected from Hughes's clothing and compared with fibers from the carpet in the apartment on Molino Avenue in Long Beach where defendant lived in April 1978. (Defendant and his roommate/lover, Jeff Seelig, had moved to a different house, but the carpet had not been changed between April 1978 and June 1983, when the samples were collected.) The fiber taken from Hughes's shorts and fibers from the Molino Avenue apartment carpet did not differ in terms of color, fiber type, diameter of the fibers, cross-sectional appearance, longitudinal appearance, delustrance or melting points. It could not be conclusively established, however, that the fiber on Hughes's shorts came from defendant's apartment on Molino Avenue. Fibers from a throw rug at defendant's house on Roswell Avenue were also compared with fibers taken from Hughes's clothing; they were found to be consistent with each other in terms of material, shape, melting points, and delustrance.

The prosecutor argued to the jury that the entry "EUCLID" on defendant's list, alluding to the location of the body, referred to Hughes. Terry Goodman testified he and defendant had a mutual friend who lived on Euclid Avenue in Long Beach, but Goodman had never heard defendant refer to the friend as "Euclid."

### 13. *Murder of Mark Howard Hall*

On December 31, 1975, Mark Howard Hall went drinking with his friend Philip Holmer. Hall, 22 years old, stood five feet eight or nine inches tall and weighed 160 to 170 pounds. After visiting a bar and attending one party, where Hall became drunk and smoked some marijuana, Holmer and Hall went to a second party, about two blocks from Interstate 5 in San Juan

Capistrano. Because Hall was so drunk, he lay down on a sofa at the second party. Holmer last saw him alive around midnight and only later discovered Hall was no longer at the home where the party was taking place.

On January 3, 1976, an off-duty Santa Ana police officer was riding dune buggies with friends in the mountains near Silverado Canyon and Bedford Peak in the area of Saddleback Mountain. About 3:00 p.m., the group discovered the dead body of Mark Hall about 25 feet from a road in that area and summoned police.

Hall's body was nude, and his genitals had been removed. Near the body was an open package of Half-and-Half brand cigarettes.[3] The cause of death was a combination of suffocation and acute alcohol intoxication. Hall's mouth and trachea had been densely packed with dirt. Repeated filling of the mouth with dirt, followed by choking, swallowing or inhaling, could have accounted for the degree of compaction; it was unlikely that intentional forcing of dirt down the trachea would have resulted in the degree of compaction of the dirt, and there was no tissue damage to indicate a rod had been used. Hall's blood-alcohol level at the time of death was 0.67 percent. For most people, a blood-alcohol level of 0.45 or 0.50 percent would be fatal. Diazepam, as well as the over-the-counter cold remedies phenacetin and methapyriline, were found in Hall's system. A cigarette lighter had been used to burn Hall's eyes, nose, moustache, left nipple and other parts of his body. The injuries to the eyes and nipple and the removal of the penis and scrotum had occurred postmortem. A swizzle stick had been shoved up the urethra of the penis into the bladder, and the genitals had been inserted into the rectum. Only one testicle was found. There were ligature marks on the right side of the neck. A 12-inch cut had been inflicted on Hall's leg postmortem.

About 11 inches from Hall's head, police found a broken bottle neck with dried type B blood on it. Hall had type B blood. About 20 feet from the body, police found a number of pieces of broken glass that appeared consistent with the bottle neck. A latent print made by defendant's right thumb was on one of the pieces of glass. That latent print lift was misplaced in the sheriff's department's filing system for a period of time; while it was missing, a forensic specialist used a new technique to lift the same latent print from the glass again, and the print was again matched to defendant's right thumb. A separate latent fingerprint, also identified as defendant's right thumb, was lifted from another piece of glass found at the scene. A criminalist fitted together the pieces of glass on which defendant's right thumbprint was found, along with other pieces, concluding they had come from the bottom of the bottle.

---

[3]Defendant smoked Half-and-Half brand cigarettes in 1976 and 1977.

The prosecutor argued to the jury that the entry "New Years Eve" on defendant's list referred to Mark Howard Hall.

In defense, several members of defendant's family testified he had attended a New Year's Eve party at the Westminster home of one of defendant's sisters until about 12:30 a.m. Those same family members testified they saw defendant again at his parents' house around 7:00 or 8:00 a.m. on January 1, 1976. He was wearing the same clothes as the night before, and nothing appeared amiss. A defense investigator drove from the location of the party defendant attended to San Juan Capistrano, from there to the location where Hall's body was found, and from there to defendant's parents' house; he concluded at least two hours and 35 minutes of driving time was required to cover the route.

### 14. *Murder of Keith Daven Crotwell*

In March 1975, Keith Daven Crotwell was 19 years old, stood six feet or six feet one inch tall, and weighed 195 to 200 pounds. On the night of March 29, 1975, Crotwell and his friend Kent May, 15 years old, went to Big John's Fun Hall near Belmont Pier and the Olympic swimming pool in Long Beach. In the course of the evening, Crotwell and May, who had both been drinking, walked to a seawall near Big John's and talked about an argument Kent had just had with a girl. Defendant approached and began to converse with them. The area was frequented by homosexuals, and May asked if defendant were homosexual; defendant denied it, stating he was merely out for a leisurely stroll. Defendant offered drugs to Crotwell and May. They went to defendant's Mustang automobile, where he gave them pills with the number "10" imprinted on them. May took six or seven of the pills, Crotwell three or four more than May, downing them with beer. Defendant then drove off with Crotwell and May in his car. May then lost consciousness, waking up with a hangover the next morning at his home.

Michael Ditmar and Randy Cooper, friends of Crotwell's, had also been at Big John's on the night of March 29, 1975, and sometime after 3:00 or 4:00 a.m. the next day they returned in Cooper's truck to the area of Big John's to look for Crotwell and May. In the Big John's parking lot, Ditmar saw a white Mustang with its passenger door open and defendant pushing May out of the backseat. May took a few steps and fell down. Defendant pushed May away from the car. Ditmar and Cooper yelled at defendant to stop and wait, but defendant drove off at a relatively fast speed toward Seal Beach with Crotwell in the front passenger seat, slumped toward defendant and possibly unconscious. Ditmar never saw Crotwell alive again.

On May 8, 1975, two young boys discovered a human skull near a jetty in the Long Beach Marina about 1,000 feet from a parking lot. Through dental X-rays, the skull was later identified as Crotwell's.

Following Crotwell's disappearance, Ditmar and Cooper looked for the Mustang in which defendant had driven off with their friend. They found it in Long Beach and forwarded information about the car to the Long Beach Police Department. Upon learning that the vehicle was registered to defendant, Detective Michael Woodward of the Long Beach Police Department contacted defendant and invited him to come to the police department for an interview.

On May 19, 1975, Detective Robert Bell of the Long Beach Police Department interviewed defendant concerning Crotwell's disappearance. The tape recording of the interview was played to the jury.

Defendant acknowledged he had, within the last couple of months, picked someone up in the Granada Avenue parking lot (which was near Big John's). Defendant described encountering two males in that location, drinking beer with them, driving around the Belmont Heights area for about 20 minutes, and returning to the parking lot, where one of the two got out of his car. The other wanted to remain in the car, so defendant drove away again, going southbound on the San Diego Freeway. Defendant said he allowed his passenger to drive, and the car became stuck on an embankment. Defendant walked to some gas stations, which were closed, and telephoned his "other half," Jeff Graves, for assistance. Defendant then had coffee at the restaurant from which he had called Graves. Because Graves had only a Volkswagen, and may have been unable to assist him, defendant asked for help from a man and his wife at the restaurant, who had a pickup truck. The man drove defendant in the pickup truck back to defendant's car. The man who had been with defendant was no longer there. The man with the pickup truck used a rope defendant found to free the car. Defendant looked around unsuccessfully for the man who had been in his car. He then went back to the restaurant to wait for Graves, who arrived later. Defendant had to go to work the next day, and Detective Bell determined that defendant indeed did work that day. Bell was aware of cars becoming stuck in the area defendant described. Defendant denied killing Crotwell or disposing of his body.

On October 19, 1975, some children in the City of Laguna Hills discovered skeletal remains, minus the skull and hands, wrapped in a rug in a large pipe. The remains were later identified as Crotwell's.

The prosecutor argued to the jury that "PARKING LOT" on defendant's list referred to Crotwell.

The defense presented evidence that on May 31, 1983, Jeff Graves told detectives that defendant had telephoned him early one morning, probably in

May 1975, saying he had had car problems and needed help. Graves said he had gone to defendant's location and assisted him.

### 15. *Murder of Ronald Gene Wiebe*

About 8:30 or 9:00 p.m. on Friday, July 27, 1973, Ronald Gene Wiebe left his mother's house in Los Alamitos to go to the Sportsman's Lodge for a few beers. He was 20 years old, five feet five inches in height, and weighed 125 to 130 pounds.

About 6:30 a.m. on July 30, 1973, Seal Beach police officers were dispatched to the Seventh Street on-ramp to the San Diego Freeway, where a body later identified as Wiebe's was found. There was no belt in the pants; the right foot was bare, but there was a sock on the left foot. The top of Wiebe's pants was undone, exposing his penis. There was a ligature mark on the victim's neck about one-quarter-inch wide. Death had occurred about two days earlier, caused by asphyxia due to ligature strangulation. Postmortem road burns were all over the body. A sock had been stuffed into the victim's rectum, apparently postmortem. The victim's penis had been "pinched" after his death. His blood-alcohol level was 0.02 percent at the time of death, and no drugs were detected in his system.

The prosecutor argued to the jury that "7TH ST." on defendant's list referred to Wiebe.

The defense presented evidence that Officer Earl Potter of the Los Alamitos Police Department knew Wiebe and was familiar with his car. While on bicycle patrol outside the Sportsman's Lodge during the early morning hours of July 28, 1973, Potter did not see Wiebe's car. Later that day or the following day, however, the car was found at a nearby Firestone Tire store. Latent fingerprints taken from Wiebe's car did not match defendant's.

### 16. *Murder of "John Doe Huntington Beach"*

About 1:00 a.m. on Saturday, April 14, 1973, a passing motorist saw a dead body on Ellis Avenue between Goldenwest and Gothard Streets in Huntington Beach and called the police. There was no identification with the body, which remained unidentified at the time of trial. The victim appeared to be between 18 and 25 years old. He wore socks but no shoes, and there was no belt in his pants. The cause of death was suffocation, perhaps caused by a gag or something put over the nose and mouth. The victim's penis and scrotum had been removed antemortem, and the loss of at least two pints of blood may have been a contributing factor in the death. There were gag

marks on the mouth and ligature marks on both wrists. The victim's nose and lips had been bruised before death. There were postmortem road burns on the body. A sharp instrument had inflicted cuts on various parts of the body after death. The victim's blood-alcohol level was 0.07 percent. Rectal swabs taken from the victim at the autopsy were found to contain spermatozoa.

William Smith, a resident of the City of Huntington Beach since 1946, worked for the city on traffic signals at the time of trial. Smith testified that, when he was in elementary school, the area where the body of "John Doe Huntington Beach" was found was known as "Airplane Hill." Children would try to ride their bicycles down one side and up the other without stopping, and high school students would try to drive their cars down the hill fast enough to get a feeling of becoming airborne. The bottom of the hill was filled in in 1960.

The prosecutor argued to the jury that "AIRPLANE HILL" on defendant's list referred to "John Doe Huntington Beach."

The defense presented evidence that latent fingerprints on beer cans along the side of the road near where the victim's body was found did not match defendant's. A witness, who had grown up in Long Beach, knew the area where the victim's body was found as "Shell Hill" rather than "Airplane Hill." Another witness testified that a different location, between the Pacific Coast Highway and Colorado Boulevard on Manila Avenue, was known as "Airplane Hill." Benjamin Paniagua, a friend of defendant's, testified defendant used to visit him in his apartment in Long Beach and that a nearby area on Manila Avenue was called "Airplane Hill." Paniagua acknowledged, however, that defendant never referred to him as "Airplane Hill." A defense investigator unsuccessfully looked for associates of defendant who were aware that defendant knew the area where the victim's body was found as "Airplane Hill."

### 17. *Murder of Edward Daniel Moore*

Around 1:45 a.m. on December 26, 1972, a California Highway Patrol officer driving in the area of the Seventh Street off-ramp from the 405 and 605 Freeways saw a group of pedestrians near a dead body later identified as that of Edward Daniel Moore. The body was on the shoulder of the off-ramp, about one-quarter mile from Seventh Street.

The victim's body was identified through his fingerprints. Moore was a United States Marine stationed at Camp Pendleton. When his body was

found, Moore was wearing a jacket, T-shirt, sweater, pants with no belt, and one sock. The other sock was found in his rectum. Moore's boxer shorts had his name, as well as another person's name, stenciled on the back.

Moore had died about three days before his body was found. The cause of death was asphyxiation through strangulation. There were ligature marks on Moore's neck and two scratch marks on the left side of his scrotum. A fist or blunt instrument had caused antemortem trauma to Moore's nose and lip. Moore's blood contained only a trace of alcohol and no drugs.

The prosecutor argued to the jury that the entry "EDM" on defendant's list referred to Moore.

### 18. *Defense Evidence Relating to the Charges Generally*

Defendant's neighbors on Roswell Avenue, Pennie De Wees and Willy Sadler, did not see anything out of the ordinary with respect to visitors at defendant's house. De Wees considered defendant a "wonderful neighbor."

Thomas Schardt, a commercial photographer specializing in forensic reconstruction, photographed a Mustang manufactured in the same year (1974) as defendant's and testified it would be extremely difficult to push open a passenger door from the driver's side because one would have to pull up on the lever and push out on the door at the same time. The prosecution, however, contended the Mustang Schardt examined was significantly different from defendant's Mustang.

### B. *Penalty Phase Evidence*

### 1. *Overview of Prosecution Case*

The prosecution presented evidence that defendant had committed an uncharged sexual assault and eight additional murders in Oregon and Michigan.

In 1970, defendant befriended 13-year-old Joseph F., who had just run away from home, took him to defendant's house, drugged him and sodomized him.

From 1980 to 1982, while on business trips to Oregon, defendant murdered six young men in separate incidents. One night in December 1982, while on a business-related trip to Grand Rapids, Michigan, defendant murdered two young men. Items belonging to the Oregon and Michigan

victims were found in the search of defendant's house. A jacket taken from one of the Oregon victims was found just outside defendant's Grand Rapids hotel room.

References to all eight out-of-state victims, the prosecutor argued, were included on the list found in defendant's car after his arrest.

### 2. *Sexual Assault on Joseph F.*

In March 1970, 13-year-old Joseph F. ran away from his Westminster home on his bicycle. He rode his bicycle up and down the boardwalk in Huntington Beach, where he encountered defendant. He asked defendant for a cigarette, which defendant gave him. After learning Joseph was a runaway, defendant offered to let him stay at his apartment. Joseph hid his bicycle and accompanied defendant on his motorcycle to defendant's apartment in Long Beach.

There, defendant gave Joseph some red capsules. Joseph swallowed four capsules initially and four more a short time later, washing them down with wine. Joseph felt drowsy and started to black out. Defendant asked Joseph if he had ever had sex with a man before and showed him photographs of men having sex with one another. Defendant was depicted in some of the photographs. Defendant began masturbating in front of Joseph and asked him to take off his clothes. Joseph was unable to resist because of the pills and alcohol he had ingested. Defendant forced Joseph to orally copulate him, slapped him and sodomized him twice, causing him pain.

Afterward, defendant said something about going to work and left the apartment. Joseph then left the apartment and went to a bar across the street, narrowly missing getting hit by a car. Someone called an ambulance, and Joseph was taken to a hospital, where his stomach was pumped. His face was bruised and his rectum was sore. Joseph never revealed to anyone that defendant had sexually assaulted him until he was interviewed by detectives in August 1983.

At the time of trial, Joseph was in custody on a parole violation. Joseph acknowledged that after telling detectives about the incident he asked for money, a vehicle and a loan, but testified he did not receive anything from any law enforcement agency.

In defense, Joseph's mother acknowledged she had told personnel at her son's school and others that Joseph was a pathological liar.

### 3. *Murder of Michael O'Fallon*

In July 1980, Michael O'Fallon left his home in Golden, Colorado, a suburb of Denver, and hitchhiked to Canada. O'Fallon, then 17 years old,

stood five feet seven inches tall and weighed 135 pounds. When he left on his trip, O'Fallon took a camera with his mother's initials, "MJO," scratched on the front.

About 12:10 a.m. on July 17, 1980, a passing motorist encountered O'Fallon hitchhiking on Interstate 5 in Oregon. About 5:00 a.m. that day, O'Fallon's body was found at the Talbot Road interchange with Interstate 5, some 10 miles south of Salem, Oregon. There were no clothes or identification with the body. The cause of death was ligature strangulation. A ligature consisting of a red shoelace bound O'Fallon's wrists together, while his ankles were bound by another lace. A white ligature connected the other two ligatures with O'Fallon's scrotum. Blood and fecal material were visible from a laceration to the anus. O'Fallon's blood contained alcohol (0.04 percent) and diazepam.

On a number of occasions defendant's employer, Lear Siegler Corporation (Lear-Siegler), sent him to its Peerless Division in Tualitin, Oregon, to help install a computer system. Defendant worked at that location between July 16 and July 18, 1980, and rented a car for that period at the Portland airport. Defendant returned the rental car to the airport. Although the Peerless building was only 25 miles from the airport, defendant drove his rental car a distance of 993 miles between July 16 and July 18.

A camera bearing the initials "MJO" and identified by O'Fallon's mother and brother as the camera Michael O'Fallon took with him on his trip was found in the search of defendant's garage.

The prosecutor argued to the jury that the entry "PORTLAND DENVER" on defendant's list referred to O'Fallon.

4. *Murder of "John Doe Oregon"*

About 4:20 a.m. on July 18, 1980 (the day after O'Fallon's body was found), the body of another deceased White male was discovered on the side of Interstate 5 about a mile south of Woodburn, Oregon. The victim, whose age was estimated at 35 to 40 years, was never identified. The victim's belt and bootlaces were missing.

The cause of death was ligature strangulation. A ligature mark about one-half-inch wide was around the victim's neck. The victim's blood contained alcohol (0.06 percent) and diazepam.

The prosecutor argued to the jury that the entry "PORTLAND ELK"[4] on defendant's list referred to "John Doe Oregon"; he reached this conclusion by process of elimination as all the other "PORTLAND" entries appeared to represent the other Oregon victims.

### 5. Murder of Michael Duane Cluck

On April 9, 1981, Michael Duane Cluck, then 17 years old and living in Kent, Washington, told his mother he was going to hitchhike to Bakersfield or Southern California to get a job. Cluck stood five feet eight inches tall and weighed 160 pounds. Cluck took with him a shaving kit his grandmother had given him. Cluck's name was on the kit.

About 8:39 a.m. the next day, Cluck's body was found in a ditch on the side of Pebbles Road about 500 feet from Interstate 5 in Oregon. The body was nude from the waist down. There was considerable blood in the facial area and blood smears on other exposed portions of the body. When found, the body was still warm to the touch.

Death had resulted from 16 wounds to the back of the head, which had caved in the victim's skull. There was a laceration and blood loss in the area of the rectum. The victim's blood contained alcohol (0.09 percent), bromo-diphenylhydramine, chlorpheniramine and codeine. His urine contained norephedrine, codeine metabolites, flurazepam metabolites and chlorpheniramine.

On the day Cluck's body was found, defendant sought medical attention in Tualitin, Oregon. He reported to the physician that he had badly bruised his toe about 3:00 a.m. that morning while moving about barefoot in his motel room to turn on the television to watch the launching of the space shuttle.

Cluck's shaving kit was found underneath some clothes in a drawer in the hallway of defendant's house.

The prosecutor argued to the jury that the entry "PORTLAND BLOOD" on defendant's list, alluding to the large quantity of blood at the murder scene, referred to Michael Cluck.

### 6. Murder of Brian Whitcher

In the early morning hours of November 24, 1982, a dead body later identified as that of Brian Whitcher was found south of Wilsonville, Oregon,

---

[4] It is unclear whether the entry read "PORTLAND ELK" or "PORTLAND ECK"; at trial, the prosecutor argued the former reading.

on the fog line of Cambry-Hubbard Road, which runs parallel to Interstate 5. There was no belt in the victim's pants, and the victim's feet were bare. The body had been thrown from a moving vehicle. The cause of death was asphyxiation, and there was a ligature mark on the victim's neck about two and one-half inches long and one-half inch wide. Whitcher's blood contained alcohol (0.31 percent) and diazepam.

Defendant was working at Peerless in Tualitin, Oregon, on November 23 and 24, 1982. He drove a rental car 232 miles during that period.

A friend of Whitcher's, Earl Davis, last saw Whitcher around noon on November 23, 1982, at which time Whitcher was wearing a distinctive brown velour pullover Davis had purchased and later given to Whitcher. That pullover was later found in the garage of defendant's home. According to Davis, Whitcher occasionally smoked marijuana.

The prosecutor argued to the jury that the entry "PORTLAND HEAD" on defendant's list referred to Brian Whitcher, in an apparent allusion to Whitcher's fondness for marijuana.

### 7. Murder of Anthony Silveira

In December 1982, Anthony Silveira, then 29 years old and a member of the National Guard Reserve, lived in Eagle Point, Oregon, with his wife. He owned an army jacket with his name tag sewn on it. On December 4, 1982, Silveira was supposed to travel from Cannon Beach, in the northwest part of Oregon, to Medford for guard duty. He did not own a car. Silveira had telephoned his wife on December 3, 1982; she never heard from him again.

Defendant was working for Lear-Siegler near Portland between December 1 and December 4, 1982.

On December 18, 1982, Silveira's dead body was found off Boone's Ferry Road near Interstate 5 west of Hubbard, Oregon. There was no clothing on the body, which appeared to have been there for a period of time as there were signs of putrefaction and nibbling by animals. Death was caused by ligature strangulation, with a ligature mark, consistent with a belt, visible at the autopsy. A toothbrush was removed from the victim's anus at the autopsy; the rectum was dilated and spermatozoa and blood were found in the anal canal. The victim's blood contained alcohol (0.23 percent) and diazepam.

On December 4, 1982, defendant visited his friend Gary Newell at the latter's home in Seattle, Washington. Defendant arrived in a rental car and,

soon thereafter, returned to the car and retrieved an army jacket that was either Silveira's or very similar to it. Both Newell and his housemate, Leonard Brouette, recalled that the name on the jacket began with "S" and was a "Hispanic-sounding" name. The next morning, defendant said he was leaving for the airport and Grand Rapids, Michigan.

Defendant stayed in room 1169 on the 11th floor of the Amway Grand Plaza Hotel in Grand Rapids from December 5 through December 8, 1982. About 10:00 a.m. on December 8, hotel security officer Ronald Ortega found Silveira's army jacket draped over a couch located in the 11th floor elevator lobby area, about 12 to 15 feet from defendant's room. Ortega turned the jacket in to the hotel's lost-and-found department.

The prosecutor argued to the jury that the entry "PORTLAND RESERVE" on defendant's list referred to Silveira.

In defense, pathologist Robert Bucklin reviewed photographs and autopsy reports concerning the Silveira case and concluded Silveira had been dead no more than three days when his body was found, although he acknowledged he had not considered the fact Silveira had failed to report for reserve duty on December 5 as scheduled. Banking and business records showed defendant was in Southern California from December 10 through December 18, 1982.

Analysis of the semen found on the toothbrush in the victim's anus established it was equally likely the semen donor was a type B secretor, a type O secretor, or a type O nonsecretor. Defendant was a type O nonsecretor, and the victim was a type B secretor.

In rebuttal, pathologist Robert Richards testified, based on the temperatures in the low 30's and 40's at the scene where the body was discovered, Silveira's body could have been there for two or three weeks before it was found, despite the relative lack of deterioration of the body.

### 8. *Murders of Dennis Alt and Christopher Schoenborn*

In December 1982, Dennis Alt, then 24 years old, lived on a farm in Kent County, Michigan, about seven miles from Grand Rapids. He stood five feet 10 inches tall and weighed 160 pounds. Christopher Schoenborn, then 20 years old, also lived on a farm near Grand Rapids, and knew and was related to Alt. Schoenborn stood six feet two inches tall and weighed 190 pounds. On December 7, 1982, Alt and Schoenborn attended an agricultural convention at the convention hall near the Amway Grand Plaza Hotel. Schoenborn was wearing a "Mighty Mac" jacket with his name inscribed on a label.

Defendant was in Grand Rapids from December 5 through December 8 to attend a seminar for his employer. The seminar concluded on the afternoon of December 7, after which defendant had a business dinner with fellow employee Ronald Titgen and two others. Following the dinner, defendant and Titgen went to Tootsie Van Kelly's bar in the Amway Grand Plaza Hotel, where they spoke with Christopher Schoenborn, a local resident whom they happened to meet, for about an hour. Titgen and defendant spoke with Schoenborn until sometime between 11:00 p.m. and midnight, when Schoenborn left and defendant said he had to make a couple of telephone calls. Titgen then went to his hotel room.

Dennis Alt was also in Tootsie Van Kelly's that evening. Dennis's cousin, Thomas Alt, saw Dennis in the bar around 11:00 p.m. Dennis had been drinking and asked Thomas to take him home. Thomas agreed but, after going back into the bar to retrieve his jacket and then paying for a round of drinks for some people he knew, Thomas could not find Dennis.

On the morning of December 9, 1982, the bodies of two men, later identified as those of Christopher Schoenborn and Dennis Alt, were found five feet from a road in a vacant field about four miles from the Alt farm and nine miles from the Amway Grand Plaza Hotel. Alt's pants were unbuttoned and his genitals were exposed. He was wearing socks but no shoes. His death was the result of asphyxiation by choking; there were linear pressure marks on the right side of his neck. Alt's blood contained alcohol (0.15 percent) and diazepam. Like Alt, Schoenborn had been choked to death, and there were parallel pressure marks on the left side of his neck. A pen with the insignia of the Amway Grand Plaza Hotel had been inserted up Schoenborn's urethra into the soft tissue of the pelvis, causing extensive hemorrhaging. Schoenborn's blood contained alcohol (0.16 percent), and there was diazepam in his stomach.

After defendant checked out of room 1169 of the Amway Grand Plaza Hotel, a housekeeping supervisor found a set of keys, which she turned in to the hotel's lost-and-found department. The keys were for Alt's Ford Bronco and Yamaha snowmobile. Schoenborn's Mighty Mac jacket, identified at trial by his mother, was found in a search of defendant's garage. Schoenborn's key chain and bottle opener were found in the pocket of a sports coat in defendant's home. Schoenborn's boots and belt were also recovered from defendant's home.

The prosecutor argued to the jury that the entry "GR 2" on defendant's list referred to Alt and Schoenborn.

### 9. *Murder of Lance Taggs*

About 10:45 p.m. on December 8, 1982, Lance Taggs, 19 years old, five feet seven inches in height and 160 pounds in weight, left his home in Tigard, Oregon. Taggs had no car and sometimes hitchhiked. Taggs carried a blue nylon tote bag, printed with "Kaneohe, Hawaii," into which he had packed his surfing clothes and his distinctive set of nunchakus. Having previously lived in Hawaii, Taggs possessed some clothes with "Hawaii" printed on them and a Hawaii state identification card.

A body, later identified as Taggs, was found the next day several feet off a road a half-mile east of Interstate 5 between Wilsonville and Canby in Oregon, less than a quarter-mile from the location where Brian Whitcher's body had been found (see *ante*, at p. 1024). The words "Local Motion" and "Hawaii" were printed on the red shirt Taggs was wearing. There were no shoes or socks on the body, which had been ejected from a moving vehicle. The cause of death was asphyxiation from the obstruction of the airway by a foreign object (an orange sock had been stuffed down Taggs's throat). The waistband of the swimming trunks Taggs was wearing was unsnapped, and it appeared he had been redressed, as the inside of the swimming trunks was dirty. Taggs's blood contained alcohol (0.07 percent), diazepam and nordiazepam (a metabolite of diazepam).

Defendant claimed reimbursement from his employer, Lear-Siegler, for expenses incurred in Portland, Oregon, on December 8 and 9, 1982.

Taggs's tote bag and nunchakus were found in the search of defendant's house.

The prosecutor argued to the jury that the entry "PORTLAND HAWAII" on defendant's list referred to Taggs.

The defense tried to show that another person was responsible for Taggs's murder. Robert Hayes, the former proprietor of a security business in Wilsonville, Oregon, testified that in the early evening hours of December 8, 1982, he had encountered Taggs hitchhiking by the freeway near Wilsonville. Hayes told Taggs to get out of the area, as a couple of murders had occurred there. Some disreputable persons, including one Lloyd Hawes, frequented a rest stop south of Wilsonville. That same evening, Hayes saw Hawes and three other men near where Taggs had been hitchhiking. The next day, Hayes learned Taggs's body had been found between one and two miles from where Hayes had seen Hawes's truck. Thereafter, Hayes quietly approached Hawes's pickup truck through some woods. As he did so, he

heard Hawes state: "That one sure bounced a long way last night, didn't he?" Later, Hayes, accompanied by a deputy sheriff, secretly searched under Hawes's camper shell, finding some clean Hawaiian shirts and a clean pair of blue jeans that would not have fit anyone in Hawes's group. These were unlikely items to find in Hawes's camper, as Hawes was a "cruddy, greasy, dirty-looking person" one could "smell . . . a block away."

### 10. *Defense Penalty Phase Evidence*

Forty-four friends, family members, former coworkers and former teachers of defendant's testified he was an intelligent, peaceful, caring person who should not be executed.

Four clergymen who interviewed defendant and his family believed the death penalty should not be imposed on defendant.

Thirteen correctional officers from the Orange County jail testified defendant had caused no problems at the jail.

Dr. Monte Buchsbaum, a professor of psychiatry, performed a positron emission tomography (PET) scan on defendant. The scan revealed abnormalities that could have been caused by a head injury or vascular problem. Similar results have been associated with obsessive-compulsive disorder. According to members of defendant's family, when defendant was a child he suffered a fall on his head that rendered him unconscious.

Dr. Craig Haney, psychologist, testified defendant would make an excellent adjustment to prison if sentenced to life imprisonment without the possibility of parole.

## II. Discussion

### A. *Guilt Phase Issues*

#### 1. *Denial of Severance Motion*

Defendant contends the trial court erred in denying his motion to sever the homicide counts and try them separately, in 16 separate trials. In support of the motion, the defense presented expert testimony by Dr. Steven Penrod, a professor of psychology who has researched the effects of joinder on jury decisionmaking. Penrod concluded that joining multiple charges against a defendant increases the likelihood of conviction, probably not because of confusion of the evidence but rather because the jury tends to infer a criminal disposition.

Section 954 provides in relevant part: "An accusatory pleading may charge . . . two or more different offenses of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately." ■ Because the charges in this case all alleged offenses of the same class, the statutory requirements for joinder were satisfied. Defendant, therefore, can predicate error in denying the motion only on a clear showing of potential prejudice. (*People v. Bradford* (1997) 15 Cal.4th 1229, 1314-1315 [65 Cal.Rptr.2d 145, 939 P.2d 259].) We review the trial court's ruling on the severance motion for abuse of discretion. (*Id.* at p. 1315.)

" ' "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." [Citation.] [¶] "The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." [Citation.] Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. [Citations.]' " (*People v. Bradford, supra,* 15 Cal.4th at p. 1315.)

Our determination whether defendant was prejudiced by joinder requires us first to examine whether evidence on each of the joined charges would have been admissible, under Evidence Code section 1101, in separate trials on the others. If so, any inference of prejudice is dispelled. (*People v. Bradford, supra,* 15 Cal.4th at pp. 1315-1316.) Conversely, however, the absence of cross-admissibility does not, by itself, demonstrate prejudice. (*Id.* at p. 1316.)

■ In denying the severance motion, the trial court in this case noted most of the evidence on the various charges would be cross-admissible. Defendant disputes that conclusion. We find his arguments unpersuasive. In a trial on each individual murder count, evidence of the other charged murders generally would have been admissible to show defendant committed the charged murder as part of a common scheme or plan, which was relevant

to the element of intent. (Evid. Code, § 1101, subd. (b); Pen. Code, § 187.) The victims shared certain characteristics, all being White males between the ages of 18 and 25, all but one being single, and most being, at the time of the offense, vulnerable by virtue of lack of transportation. The method of obtaining control over the victims was similar in most of the charged offenses: Defendant generally supplied the victims with alcohol and drugs, often diazepam, to the point they could no longer resist, whereupon defendant generally bound their wrists with ligatures, frequently using shoelaces. After gaining control over the victims in such a manner, unless they were already succumbing from the effects of the drugs, defendant killed them, often by ligature strangulation. After the victims' deaths, defendant disposed of the bodies generally by dumping them from his car, usually on or near a freeway or other roadway. And each murder involved some type of arguably sexual activity or aberration, whether taking the form of sodomy, mutilation or stripping the victim of clothing.

As this court noted in *People v. Ewoldt* (1994) 7 Cal.4th 380 [27 Cal.Rptr.2d 646, 867 P.2d 757]: "To establish the existence of a common design or plan, the common features must indicate the existence of a plan rather than a series of similar spontaneous acts, but the plan thus revealed need not be distinctive or unusual. For example, evidence that a search of the residence of a person suspected of rape produced a written plan to invite the victim to his residence and, once alone, to force her to engage in sexual intercourse would be highly relevant even if the plan lacked originality. In the same manner, evidence that the defendant has committed uncharged criminal acts that are similar to the charged offense may be relevant if these acts demonstrate circumstantially that the defendant committed the charged offense pursuant to the same design or plan he or she used in committing the uncharged acts. Unlike evidence of uncharged acts used to prove identity, the plan need not be unusual or distinctive; it need only exist to support the inference that the defendant employed that plan in committing the charged offense. [Citation.]" (*Id.* at p. 403.) In general, the charged offenses in this case were sufficiently similar to each other to support an inference that defendant acted according to a plan. Indeed, some aspects of each of the offenses were sufficiently similar to each other as to support instructions on modus operandi, as discussed *post*, at pages 1061-1062.

We reject defendant's contention that the evidence in each charged murder had to be so similar as to establish a distinctive "signature" for cross-admissibility under the common plan theory pursuant to Evidence Code section 1101, subdivision (b). As we observed in *People v. Ewoldt, supra,* 7 Cal.4th at page 403, a lesser degree of similarity is necessary to admit evidence of other offenses to prove a common design or plan than to prove

identity. That all of the charged murders were not committed in exactly the same way, therefore, does not preclude cross-admissibility.

The Attorney General contends evidence of the charged murders was also cross-admissible to refute certain anticipated defenses. For instance, the Attorney General contends evidence of other murders involving the provision of drugs to the victims would have been admissible in a trial of the Crotwell charge to refute the explanation defendant offered to police, i.e., he merely provided drugs to Crotwell and took him for an automobile ride, but played no role in his death. To the contrary, the Attorney General reasons, evidence that defendant murdered other persons whom he had supplied with alcohol and drugs would be admissible to show that defendant gave Crotwell drugs and took him for a drive, not as a gesture of friendship, but in order to render him vulnerable to an attack by defendant. The Attorney General additionally contends evidence of the DeVaul, Church and Loggins homicides (those in which photographs of the victims were found in defendant's car and house) was cross-admissible to refute any suggestion the defense might offer in a severed trial that the photographs were innocently obtained on dates preceding the victim's death. In this regard, the Attorney General observes that the prosecution presented evidence the photographs of Loggins were taken after his death, a proposition the defense disputed. The Attorney General contends further that evidence of all of the charged murders was cross-admissible to refute any possible defense of accident in the cases of those victims whose death may have been caused by drug or alcohol intoxication, i.e., Loggins, Crisel and Klingbeil. Defendant contends that because he did not, at trial, actually take the stand to proffer these explanations in avoidance of murder liability, they may not now support the denial of severance. ▪▪▪ He overlooks, however, that in assessing whether the trial court abused its discretion in denying severance, we examine the state of the record at the time of the ruling. (*People v. Price* (1991) 1 Cal.4th 324, 388 [3 Cal.Rptr.2d 106, 821 P.2d 610].)

▪▪▪ For the foregoing reasons, we conclude the trial court did not abuse its discretion in denying defendant's motion to sever the murder charges.

### 2. *Admission of Death List*

▪▪▪ Defendant contends the trial court erred in admitting into evidence a handwritten document the prosecution characterized as a coded list of defendant's victims. The list, he argues, lacked probative value because any connection between the entries on the list and particular victims was speculative. Defendant also contends any relevancy the list possessed was outweighed by its prejudicial impact. Additionally, he asserts the list constituted

inadmissible hearsay. He further argues that admission of the list violated the heightened evidentiary reliability requirements in capital cases, established by the Eighth and Fourteenth Amendments to the federal Constitution. We find no abuse of discretion in the admission of the list.

After defendant was arrested on May 14, 1983, Orange County Sheriff's deputies searched defendant's car pursuant to a warrant. Among the items recovered in the search was a notebook containing a sheet of paper bearing 61 cryptic entries in defendant's handwriting. The prosecution contended the list memorialized defendant's various murder victims and that 13 of the entries corresponded to murder counts tried in the guilt phase of this case. The prosecution further contended eight additional entries referred to murders defendant committed in Oregon and Michigan, evidence of which was presented in the penalty phase. The prosecution also asserted 21 additional uncharged victims were represented on the list, while acknowledging the remaining entries could not be linked to a specific victim. Four of the entries included the numeral "2," which, according to the prosecution, referred to two victims.

The defense moved in limine to exclude the list from evidence, citing as grounds the hearsay rule, lack of relevancy, absence of a corpus delicti for some of the entries, and the unduly prejudicial effect of references to uncharged crimes. In response, the prosecution stated it would not seek to introduce the entire list into evidence unless the defense so requested. Instead, the prosecution sought to introduce only the 13 entries corresponding to 14 of the murder charges. (The prosecution believed Gambrel was not represented on the list, as defendant would not have had time to add an entry for him, and it was unable to determine which, if any, entry corresponded to victim Eric Church. The prosecution believed one entry, "2 IN 1 BEACH," referred to both Rodger James DeVaul, Jr., and Geoffrey Alan Nelson.) In the course of the hearing on the in limine motions, the trial court rejected the prosecution's argument that the nature of the list should be determined based on an examination of all the entries; the court concluded instead that the focus properly lay only on those assertedly relating to the charged counts. At the conclusion of the hearing, the trial court ruled the 13 entries admissible. In the abstract, the court acknowledged, the entries "mean[t] nothing," but in the context of the evidence on the corresponding counts, the prosecution's interpretation of the list as a death list was reasonable. The court declared it would leave it to the jury to give the list whatever weight it thought appropriate. The trial court further concluded, pursuant to Evidence Code section 1220, that the entries were not subject to exclusion as hearsay. Finally, the court ruled that the probative value of the list outweighed any prejudice flowing from its admission.

We conclude the trial court properly overruled each of the defense objections to the list.

First, the trial court could, in the exercise of sound discretion, conclude the list was relevant. It had a tendency in reason to prove a disputed fact of consequence to the case (Evid. Code, § 210), namely defendant's awareness of certain characteristics of the charged murders. For example, the prosecution argued the entry "MC HB Tattoo" referred to victim Loggins, who was last seen by his fellow Marines at the pier in Huntington Beach, and who had a large tattoo; "Marine Carson," the prosecution contended, referred to victim Keith, a Marine who was last seen alive by his girlfriend in Carson.

Indeed, the conclusion is strengthened by examination of certain entries strongly suggesting some of the uncharged murders, evidence of which was later presented in the penalty phase. "Portland Hawaii," the prosecution asserted, meant Lance Taggs, a resident of Tigard, Oregon, who previously had lived in Hawaii. Taggs carried a bag with "Kaneohe, Hawaii" printed on it. His body, clad in a shirt bearing the words "Local Motion" and "Hawaii," was found on December 9, 1982, beside a road a half-mile west of Interstate 5 between Wilsonville and Canby in Oregon. Defendant claimed reimbursement from his employer for travel expenses incurred in Portland, Oregon, on December 8 and 9, 1982; Taggs's distinctive nunchakus were recovered from defendant's garage after his arrest. "Portland Reserve" referred to Anthony Silveira, a member of the National Guard Reserve, whose decomposed body was found off Boone's Ferry Road near Interstate 5 just west of Hubbard, Oregon. The method by which Silveira was killed closely fit the pattern of defendant's California offenses. Silveira had owned an army jacket with his name tag sewn on it, similar to one acquaintances of defendant testified he possessed around the time Silveira disappeared on December 4, 1982. Silveira's jacket was found in a lobby of the Amway Grand Plaza Hotel in Grand Rapids, Michigan, on December 8, 1982, some 12 to 15 feet from the room in which defendant was then staying.

Contrary to the trial court, we see no impropriety in gleaning the significance of the document as a whole, or of certain entries, partly in light of other entries not admitted in the guilt phase. As the Attorney General argues, the fundamental issue in determining admissibility was whether the document constituted a list of murder victims, and in answering that question the trial court properly could consider all available information pertaining to the list. If no other entry, besides the 13 assertedly relating to the charged victims, could be associated with a homicide victim, the trial court could have considered that fact as suggesting the document was not, in fact, a list

of defendant's victims. By the same token, however, the fact the prosecution could link numerous entries on the list to uncharged victims suggests the list was what the prosecution contended it to be. In any event, the trial court's conclusion the document was admissible as a list of victims finds support in the record.

Defendant correctly observes that evidence leading only to speculative inferences is irrelevant. (*People v. De La Plane* (1979) 88 Cal.App.3d 223, 244 [151 Cal.Rptr. 843].) We do not agree, however, that because the entries were idiosyncratically coded and required interpretation to be understood by a reader, to ascribe a particular meaning to a given entry necessarily was speculative. The trial court did not abuse its discretion in concluding each of the 13 entries reflected a sufficient nexus with some aspect or aspects of the particular case to be relevant and admissible.

Second, although the list constitutes hearsay, the trial court correctly ruled it admissible under the exception for statements by a party. (Evid. Code, § 1220.) Contrary to what defendant suggests, *People v. Allen* (1976) 65 Cal.App.3d 426 [135 Cal.Rptr. 276] did not hold that to qualify under this exception to the hearsay rule a statement must be clear and unambiguous. That case, rather, involved a statement, clear on its face, to which the prosecution sought to ascribe a different, inculpatory meaning not directly inferable therefrom; the Court of Appeal rejected the effort as speculative.

Third, we find no abuse of discretion in the trial court's conclusion the list was more probative than prejudicial, over defendant's objection pursuant to Evidence Code section 352. The list itself was not inflammatory; as redacted, it did not suggest defendant was guilty of other offenses. Despite the prosecutor's argument the entries on the list referred to specific victims, and thus corroborated the other incriminating evidence in the case, the defense could and did urge the jury to reject any correlations it found unreasonable. Presumably the jury accorded no weight to any entry it found did not relate to a charged victim. Admission of the list, therefore, would not have prejudiced defendant within the meaning of Evidence Code section 352. For this reason, too, even had the trial court abused its discretion in admitting the list, reversal of defendant's convictions would be unwarranted. (*People v. Watson* (1956) 46 Cal.2d 818, 835-836 [299 P.2d 243].)

Finally, we reject defendant's contention that the admission of the list violated what he terms the heightened reliability requirements of the federal Constitution in capital cases. Application of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights. (See *People v. Cudjo* (1993) 6 Cal.4th 585, 611 [25 Cal.Rptr.2d

390, 863 P.2d 635].) Defendant fails to persuade us this case constitutes an exception to that general rule.

### 3. *Denial of Motion to Suppress*

Defendant contends the trial court erred in denying his motion to suppress evidence seized in searches of his house, car, business, and pharmacy records. He chronicles in minute detail the sequence of events from the time the California Highway Patrol pulled him over in the early hours of May 14, 1983, through the execution of the third (i.e., the May 18, 1983) warrant to search his residence. He also catalogues exhaustively the items seized in each search. Lacking, however, is any clear explanation of how most of the seized items were used against him, an omission that renders difficult a discussion of prejudice. In any case, we conclude the searches were constitutionally valid.

█ At the outset, we set forth the principles guiding our review of the trial court's ruling on the motion to suppress. Whereas the trial court's task is to find historical facts, select the appropriate rule of law, and apply the latter to the former to determine whether the rule so applied was or was not violated, on appeal we, as the reviewing court, must uphold the trial court's findings of fact if they are supported by substantial evidence. We, however, independently review the trial court's selection of the relevant legal principle and its application of the rule to the facts as found. (*People v. Williams* (1988) 45 Cal.3d 1268, 1301 [248 Cal.Rptr. 834, 756 P.2d 221].) Admission of unlawfully seized evidence is not reversible error per se, but rather is subject to harmless error analysis. (E.g., *People v. Rich* (1988) 45 Cal.3d 1036, 1080 [248 Cal.Rptr. 510, 755 P.2d 960].)

█ Preliminarily, we also note that the offenses of which defendant was convicted span the years 1972-1983, thus implicating the law as it existed both before and after the June 9, 1982, enactment of the truth-in-evidence provisions of Proposition 8 (Cal. Const., art. I, § 28, subd. (d)). Subject to Proposition 8 are only the counts relating to victims Gambrel, Church, Nelson and DeVaul.[5] (See *People v. Smith* (1983) 34 Cal.3d 251, 262 [193 Cal.Rptr. 692, 667 P.2d 149] [construing Prop. 8 to apply only to criminal

---

[5]Article I, section 28, subdivision (d) of the California Constitution provides: "Except as provided by statute hereafter enacted by a two-thirds vote of the membership in each house of the Legislature, relevant evidence shall not be excluded in any criminal proceeding, including pretrial and post conviction motions and hearings, or in any trial or hearing of a juvenile for a criminal offense, whether heard in juvenile or adult court. Nothing in this section shall affect any existing statutory rule of evidence relating to privilege or hearsay, or Evidence Code, Sections 352, 782 or 1103. Nothing in this section shall affect any existing statutory or constitutional right of the press."

proceedings arising out of offenses committed on or after the date it took effect].) This case brings to mind Justice Richardson's prediction, in his dissent in *Smith*, that "a single search conducted after the adoption of Proposition 8 which may disclose evidence of multiple crimes could be ruled valid as to certain crimes, and invalid as to others." (*Id.* at p. 274 (dis. opn. of Richardson, J.).) The Attorney General asks this court to overrule *Smith* and thereby correct the anomaly identified by Justice Richardson. (7) He observes that, as we reasoned in *Tapia v. Superior Court* (1991) 53 Cal.3d 282, 293-297 [279 Cal.Rptr. 592, 807 P.2d 434], federal ex post facto law has, since *Smith*, been simplified (*Collins v. Youngblood* (1990) 497 U.S. 37 [110 S.Ct. 2715, 111 L.Ed.2d 30]), and it is now clear that modifying the rules concerning the admission of evidence does not violate the ex post facto clause of the federal and state Constitutions.

The trial court in this case declined to decide whether or not the provisions of Proposition 8 governed all charged counts, concluding its ruling on the suppression motion would be the same regardless of which law applied. We conclude the trial court's conclusion was correct and, for the same reason, we decline the Attorney General's invitation to reconsider *Smith*.

We address defendant's challenges to the various searches in chronological order:

a. *Defendant's detention and arrest*

■ Defendant acknowledges that California Highway Patrol officers properly stopped him, initially, for committing the infraction of driving on the shoulder. Nevertheless, defendant contends his subsequent arrest was unlawful because, once he had completed the field sobriety tests, probable cause did not exist to believe he had been driving under the influence. At that point, defendant argues, his detention began to be unduly prolonged and the evidence thereby discovered—including the body of Terry Gambrel and all the evidence discovered as a result—must be suppressed. We disagree.

The governing law is well settled. An arrest is valid if supported by probable cause. Probable cause to arrest exists if facts known to the arresting officer would lead a person of ordinary care and prudence to entertain an honest and strong suspicion that an individual is guilty of a crime. (*People v. Price, supra,* 1 Cal.4th at p. 410.)

The following facts provide ample support for the trial court's ruling that probable cause supported defendant's arrest for driving under the influence. As noted, California Highway Patrol Officer Michael Sterling, accompanied

on patrol by Sergeant Michael Howard, noticed defendant's car weaving extensively in its lane and saw it go over the fog line. After Officer Sterling activated his red light in an attempt to pull defendant's car over, defendant's car "straightened up" and reduced its speed to about 30 miles per hour, but did not stop. Even after Officer Sterling activated the pulsating "wigwag" lights and Sergeant Howard shined a spotlight into defendant's car, defendant continued northbound another quarter of a mile before stopping. Before defendant pulled over, Howard saw him reach into the backseat area of the car, grab a dark cloth object and place it in the right front seat area of the car. Defendant failed to comply with Officer Sterling's order to pull past a roadside guardrail.

After defendant emerged from his car and met Sterling between the two vehicles, Sterling noticed defendant's jeans were unbuttoned, except for the top button, at the fly. He also noticed a moderate odor of alcohol emanating from defendant's person.

Sterling had defendant walk to the front of defendant's car to perform field sobriety tests. Sterling noticed there was a passenger reclined in the front seat of the car, but did not at that time make contact with him. Following a demonstration by Sterling, defendant performed the modified position-of-attention test, in which the subject, standing with heels and toes together, tilts his head back and closes his eyes, then tries to stand as straight as possible without swaying. Defendant swayed about two inches in a circular motion. Sterling did not consider defendant to have performed that test well. Sterling then demonstrated the next test, in which the subject walks as straight as possible, forward and backward, with heels and toes touching. In performing the test, defendant sidestepped left to right about three inches. Sterling next demonstrated, and defendant performed, a test in which the subject stands on one foot and holds the other foot about six inches off the ground until told to put it down. Defendant performed well standing on his right foot, but allowed his right foot to touch the ground once while standing on his left foot. Finally, Sterling demonstrated, and defendant performed, a hand-pat test, in which one hand is held with the palm up while the other hand is used to slap the palm and then the back of the hand. The hands are rotated and the subject counts while performing the test. Defendant failed to turn his hand over completely during most of the test, contrary to instructions. Taking the tests as a whole, Sterling concluded defendant had failed them. Sterling noticed defendant's eyes were watery, although he had no trouble with his speech. During the testing process, defendant told Sterling he had been drinking with a friend and had had three or four drinks, but he denied being drunk.

Based on his observations of defendant and defendant's statements, Sterling concluded defendant had been driving under the influence; Howard shared that opinion. Sterling placed defendant under arrest.

While Sterling was conducting the field sobriety tests, Sergeant Howard saw a passenger reclining in the Toyota's front seat. After defendant was arrested and handcuffed, the officers asked him the identity of his passenger to determine whether the car could be released to him. Defendant told Sterling his passenger was a hitchhiker. Howard shined his flashlight into the Toyota's interior to check the position of the passenger's hands. The passenger had a jacket on his lap and his hands were at his sides; he appeared to be asleep. An intact bottle, resembling a beer bottle, was between his feet. A similar bottle, broken and with a foamy residue around it and liquid running from it, lay outside the driver's door. A portion of the passenger's buttocks was visible, his jeans having been pulled very low. As Sterling was putting defendant into the patrol car, Howard tried to rouse the passenger by shouting and knocking on the window. The passenger did not respond. Howard went around to the unlocked driver's door and opened it. He observed a brown pill vial labeled "Ativan" between the driver's seat and the doorsill, removed it and placed it on the roof of the car. He also removed a folded buck knife from the driver's seat and placed it, likewise, on the roof of the car. Using his flashlight, Howard observed in the backseat a cooler, another pill vial and a leather belt or strap. He tried again to awaken the passenger by shaking his shoulder through his shirt and shouting at him, without receiving a response. Howard went around to the passenger's side and unlocked the door for easier access. Howard again shook him and shouted at him, then checked for vital signs. He detected neither pulse nor respiration, and the pupils did not respond to light.

Citing the fact his driving had improved immediately after the Highway Patrol officers activated their red light, defendant argues his arrest for driving under the influence was improper because he was not intoxicated, but merely distracted. He notes his own fly was undone when he was stopped and that Gambrel's genitals were exposed, suggesting masturbation was the reason for his erratic driving. As the Attorney General points out, however, the arresting officers did not discover the condition of Gambrel's body until after defendant was in custody; thus, contrary to defendant's argument, "other reasons" (besides intoxication) for defendant's poor driving were not "immediately apparent." Defendant further contends his performance on the field sobriety tests did not support the conclusion he was under the influence of alcohol, but the opinions of Officer Sterling and Sergeant Howard were to the contrary. We see no evidence in the record that the officers unduly prolonged defendant's detention. Cases cited by defendant, such as *People v. McGaughran* (1979) 25 Cal.3d 577 [159 Cal.Rptr. 191, 601 P.2d 207], *Williams v. Superior Court* (1985) 168 Cal.App.3d 349 [213 Cal.Rptr. 919], and *People v. Lingo* (1970) 3 Cal.App.3d 661 [83 Cal.Rptr. 755], in which courts invalidated arrests made after unduly prolonged detentions, are therefore inapposite. Consequently, the trial court, based on the

circumstances as a whole, properly could find the officers had probable cause to arrest defendant for driving under the influence. It follows that we must reject defendant's derivative contention, based on the doctrine of the fruit of the poisonous tree (see generally *Wong Sun v. United States* (1963) 371 U.S. 471, 484-488 [83 S.Ct. 407, 415-417, 9 L.Ed.2d 441]), that the seizure of his car and its subsequent search violated his Fourth Amendment rights.

Defendant complains further that Sergeant Howard's seizure of the buck knife and Ativan from defendant's car was improper because, at the time of seizure, probable cause to believe defendant had committed murder was lacking. Defendant notes Howard testified he did not know what Ativan was. We conclude, however, that Howard properly could seize the vial of Ativan because, as he testified at the hearing on the suppression motion, he suspected defendant may have been under the influence of both alcohol and drugs. And the seizure of the knife clearly was proper so that defendant's passenger would not be able to reach it and thereby jeopardize the officers' safety. In any case, the Ativan and knife inevitably would have been discovered once defendant was taken into custody, as the officers would have checked on the passenger to ensure his safety in leaving the scene of the arrest. Their seizure by Sergeant Howard therefore was proper. (*Nix v. Williams* (1984) 467 U.S. 431, 444 [104 S.Ct. 2501, 2059, 81 L.Ed.2d 377]; *People v. Superior Court (Tunch)* (1978) 80 Cal.App.3d 665, 673 [145 Cal.Rptr. 795].)

### b. *The search of defendant's car*

 As he did below, defendant challenges the search of his car conducted after his arrest. He argues both that the warrant was overbroad and unsupported by probable cause and that the search exceeded the scope of the warrant and amounted to an unconstitutional general search. We conclude defendant's challenges lack merit.

 We summarize the relevant legal principles governing an appellate challenge to the validity of a search warrant and the search conducted pursuant to it. The question facing a reviewing court asked to determine whether probable cause supported the issuance of the warrant is whether the magistrate had a substantial basis for concluding a fair probability existed that a search would uncover wrongdoing. (*Illinois v. Gates* (1983) 462 U.S. 213, 238-239 [103 S.Ct. 2317, 2332, 76 L.Ed.2d 527]; *People v. Camarella* (1991) 54 Cal.3d 592, 600-601 [286 Cal.Rptr. 780, 818 P.2d 63].) "The task of the issuing magistrate is simply to make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before

him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." (*Illinois v. Gates, supra,* at p. 238 [103 S.Ct. at p. 2332].) In a pre-Proposition 8 case, we stated: "In determining the sufficiency of an affidavit for the issuance of a search warrant the test of probable cause is approximately the same as that applicable to an arrest without a warrant, . . . [citations], namely, whether the facts contained in the affidavit are such as would lead a man of ordinary caution or prudence to believe, and conscientiously to entertain, a strong suspicion of the guilt of the accused." (*Skelton v. Superior Court* (1969) 1 Cal.3d 144, 150 [81 Cal.Rptr. 613, 460 P.2d 485].) The magistrate's determination of probable cause is entitled to deferential review. (*Illinois v. Gates, supra,* at p. 236 [103 S.Ct. at p. 2331]; see *Skelton v. Superior Court, supra,* at p. 153 [magistrate's determination "is to be sustained by reviewing courts as long as there was a 'substantial basis' for his conclusion that the legitimate objects of the search were 'probably present' on the specified premises"].)

The warrant clause of the Fourth Amendment provides that no warrant may issue except those "particularly describing the place to be searched, and the persons or things to be seized." (U.S. Const., 4th Amend.; *Walter v. United States* (1980) 447 U.S. 649, 656-657, fn. 8 [100 S.Ct. 2395, 2402, 65 L.Ed.2d 410].) The constitutional requirement of particularity protects against " 'general, exploratory rummaging in a person's belongings,' " but in a complex case resting on the piecing together of "many bits of evidence," the warrant properly may be more generalized than in a simpler investigation resting on more direct evidence. (*Andresen v. Maryland* (1976) 427 U.S. 463, 480, 481, fn. 10 [96 S.Ct. 2737, 2748, 49 L.Ed.2d 627]; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1043 [90 Cal.Rptr.2d 607, 988 P.2d 531].) Whether the description in a warrant of property to be seized is sufficiently definite is a question of law subject to independent review by the appellate court. (*Thompson v. Superior Court* (1977) 70 Cal.App.3d 101, 108 [138 Cal.Rptr. 603].)

Searching officers may seize items specifically named in a valid warrant, as well as other items in plain view, provided the officers are lawfully located in the place from which they view the items and the incriminating character of the items as contraband or evidence of a crime is immediately apparent. (*Horton v. California* (1990) 496 U.S. 128, 136 [110 S.Ct. 2301, 2307, 110 L.Ed.2d 112]; see *Guidi v. Superior Court* (1973) 10 Cal.3d 1, 6 [109 Cal.Rptr. 684, 513 P.2d 908].)

Later in the morning hours of the day of defendant's arrest, the prosecution obtained a warrant for the search of his car by means of a

telephonic affidavit procedure. Deputy Charles Bensinger of the Orange County Sheriff's Department related under oath his own observations and what the arresting officers had told him concerning the circumstances of defendant's arrest, as follows: At 1:19 a.m. on May 14, 1983, Bensinger proceeded to the location where California Highway Patrol officers had stopped defendant's car. There Officer Sterling informed Bensinger how he had stopped the car, administered field sobriety tests and arrested defendant for driving under the influence of alcohol. Sterling told Bensinger he had noticed defendant's blue jeans fly was partially unbuttoned. Both Sterling and Howard told Bensinger they could not rouse the passenger in defendant's car and that he appeared to be dead. Howard gave Bensinger a vial of Ativan pills that had been prescribed for defendant, which he had found on the floor between the driver's seat and the door panel. Howard told Bensinger that, after removing a jacket from the victim's lap, he saw the victim's pants were pulled below his knees and his penis was exposed. Howard also told Bensinger he had found a knife on the driver's seat. Bensinger proceeded to the hospital, where the victim was pronounced dead. The victim, a 25-year-old White male, was identified as Terry Lee Gambrel.

Orange County Sheriff's investigator James Sidebotham was also sworn for the affidavit. Sidebotham visited the morgue and viewed Gambrel's body, noticing ligature marks on both wrists, a faint ligature mark around the neck, and petechial hemorrhages in the eyes and lower gums, which are indicative of strangulation. Sidebotham had learned that when Gambrel was removed from defendant's car, no shoes were on the body. Based on Sidebotham's prior investigation of more than 25 "homosexual type homicides" and information he had received concerning the death of Gambrel, Sidebotham believed the Gambrel homicide was also a "homosexual type homicide."[6]

Based on the foregoing information, Orange County Superior Court Judge Richard Beacom authorized Sidebotham to place Beacom's signature on the search warrant.

First, defendant argues the warrant that authorized officers to search his car for evidence relating to homicides was invalid because probable cause did not exist to believe defendant had committed murder. Defendant seems

---

[6]At the time he applied for the warrant to search defendant's car, Sidebotham was familiar with the circumstances of the murders of three other young men—Rodger James DeVaul, Jr., Geoffrey Alan Nelson and Eric Herbert Church. All had drugs and alcohol in their systems at the time of death. All were killed by ligature strangulation. Ligature marks were found on the wrists of Church and DeVaul. In all three cases, as with Gambrel, the ligature marks were faint. The bodies of Nelson and Church had been thrown from moving vehicles. DeVaul had been with Nelson before their deaths. Nelson's body had been emasculated.

to suggest the police had probable cause only to search the car for intoxicants relating to his arrest for driving under the influence. This argument must fail, given that a victim of ligature strangulation was found dead in the front seat of defendant's car and that investigating officers suspected defendant was responsible for several other murders committed by similar means.

Defendant further argues the warrant was overbroad and used as a pretext for an impermissible general or exploratory search. (*United States v. Rabinowitz* (1950) 339 U.S. 56, 62 [70 S.Ct. 430, 433-434, 94 L.Ed. 653].) We disagree. The warrant was indeed broad in scope, but such breadth was the inevitable result of a murder investigation involving multiple suspected victims. We conclude the breadth of the warrant in this case was commensurate with the scope of the investigation. Contrary to defendant's argument, the mere fact a large number of items were seized, many of which were not listed in the warrant, does not establish that the search was an illegal general search. Searching officers may seize items not listed in the warrant, provided such items are in plain view while the officers are lawfully in the location they are searching and the incriminating character of the items is immediately apparent. (*Horton v. California, supra*, 496 U.S. at p. 136 [110 S.Ct. at pp. 2037-2038].) Defendant complains that investigators "literally cleaned out the car, top to bottom," "with no knowledge that the items being seized related to any particular crime." But he cites no authority requiring that items be associated with a *particular* crime as a prerequisite to their seizure; as noted, it is sufficient that the investigators have probable cause to believe the item is evidence of *some* crime.

Defendant argues the officers could not lawfully search every portion of his car, and in particular had no right to lift the floor mats and thereby discover photographs that eventually linked defendant to the murders of Loggins, DeVaul and Church. His argument is strained, especially since the warrant specifically authorized officers to search for photographs. By looking under the floor mats, officers merely looked in a spot where the specified evidence of crime plausibly could be found, even if it was not a place where photographs normally are stored.

Defendant also faults investigating officers for testing the entire car for blood.[7] He contends a search for blood could not have been reasonably related to the death of Gambrel, whose body bore no obvious wounds. Assuming for argument's sake that the warrant was overbroad to the extent it authorized a search for blood without supporting allegations relating to the Gambrel murder, the blood inevitably would have been discovered during

---

[7]Defendant also complains the search for fingerprints throughout his car was unconstitutional, but he does not suggest fingerprints were found or used against him.

the search for items validly specified in the warrant. The warrant authorized officers to search for papers indicating who owned the car, and documents or photographs relating to any sexual motivation for killing Gambrel, as well as for shell casings, bullets, bullet fragments, hair and fiber samples, and the victim's clothing. In the course of their search, the officers could properly remove the passenger seat cover, as they reasonably could believe such items might be found there. In fact, once the seat cover had been removed, the sheriff's employee photographing the interior of the car leaned against the passenger seat and noticed it was saturated with a pinkish liquid. At that point, the officers suspected the presence of blood and took steps to confirm its presence. Having found a substance suspected to be blood, searching officers clearly had probable cause to believe criminal activity had occurred in the car, despite the absence of obvious wounds on Gambrel's body, and reasonably would have continued to search for blood elsewhere in the car.

Defendant complains the pinkish liquid was not determined to be human blood until a later time. To the extent he is suggesting the character of the liquid had to be definitively identified before police could seize it, he is wrong. At the time officers discovered the pinkish liquid, they had probable cause to believe it was blood and that it constituted evidence of crime.

Defendant argues further that searching officers acted in flagrant disregard of the scope of the warrant, thus rendering unconstitutional the seizure of numerous items not specifically named in the warrant. Citing *U.S. v. Foster* (10th Cir. 1996) 100 F.3d 846, 847, 849-850, he urges the proper remedy for this general search is blanket suppression of all items seized, including those specifically named in the warrant. Without passing upon the question ourselves, we previously have acknowledged that a majority of the federal circuits recognize the remedy of blanket suppression in a sufficiently egregious case. (See *People v. Bradford, supra,* 15 Cal.4th at pp. 1304-1307 [assuming, rather than accepting, availability of blanket suppression remedy, and concluding the defendant had failed to establish that searching officers acted in flagrant disregard of warrant].) Here, as well, we may assume for argument's sake that such a remedy may be appropriate in extreme circumstances, but we have no difficulty concluding this case does not present them. To the contrary, the record provides ample support for the magistrate's implicit conclusion that all of the items seized from defendant's car were taken either pursuant to warrant or, under the plain view doctrine, with probable cause to believe they constituted evidence of murder.

c. *Seizure of business binder containing list from trunk of defendant's car*

 Defendant contends investigating officers improperly seized from the trunk of his car the business binder, later found to contain the list of

cryptic entries that the prosecution maintained was a death list. He argues the justifications asserted for the seizure (i.e., to check for fingerprints and bodily fluid residues) were unreasonable given the circumstances of Gambrel's death and the apparent absence of any such residues on the binder. Defendant, however, fails to acknowledge the warrant authorized the seizure of various types of papers, including "any written material pertaining to the homicide," "papers and identification from areas of death scene tending to show identity and or relationship of victim to potential suspect or suspects" and "papers and identification showing owner, occupier or person who has dominion and control of vehicle." As the Attorney General notes, at the time of the search it may have appeared the binder could contain information showing who was in possession of the car, information indicating some relationship between the victim and defendant, or information concerning a motive for murder. That defendant, on arrest, stated Gambrel was a hitch-hiker did not foreclose a search for such information among the papers in the trunk of defendant's car, inasmuch as (assuming the truth of the statement) "written material pertaining to the homicide" could include a written plan or notes prepared in advance of the crime.

### d. Searches of defendant's home

 Defendant challenges each of the three searches of his home, contending probable cause did not support the three warrants authorizing the searches and that searching officers improperly seized items outside the scope of the warrants. He also contends the second and third searches were invalid because they were directed at seizing evidence of crimes committed outside California. As will appear, his contentions lack merit. To place his claims in perspective, we review the process by which the three warrants were obtained.

### (1) First warrant

On the afternoon of May 14, 1983, later in the day of defendant's arrest, the first telephonic affidavit for the search of defendant's home was presented to Judge Beacom of the Orange County Superior Court. The information investigator Sidebotham had submitted in the affidavit for the search of defendant's car was incorporated into this affidavit. Sidebotham stated that, during the search of the car, he had found vials of various prescription drugs, prescribed for defendant, in the car's glove compartment. One such drug was propranolol, sold under the trade name Inderal. An empty vial of Valium was found behind the driver's seat. Two beer bottles were also found in the car. In the trunk of the car several photographs of males, some clothed and others unclothed, were found. One depicted a man who appeared to be

dead, sitting on a couch. The passenger seat cushion was found to be saturated with what a criminalist determined was blood. Gambrel, however, was not the source of the blood, as his body had no obvious injuries that would have caused any great amount of bleeding.

The pathologist who performed the autopsy on Gambrel had informed Sidebotham that the cause of death was ligature strangulation. Sidebotham was aware of other recent murder cases involving young men who were killed by ligature strangulation. These included Eric Herbert Church, whose body was found on January 27, 1983, on the northbound on-ramp to the 605 Freeway after apparently having been dumped from a vehicle; Geoffrey Alan Nelson, whose nude, emasculated body was found on the Euclid Street on-ramp to the Garden Grove Freeway on February 12, 1983; and Rodger James DeVaul, Jr., whose body was found in the Mt. Baldy area about February 14, 1983. A photograph found in defendant's car depicted an individual wearing clothing similar to that worn by Church when his body was found. A photograph of DeVaul, apparently taken postmortem, was found in the trunk of defendant's car. Nelson and DeVaul had last been seen alive together. All three had alcohol and Valium in their systems, and Nelson and DeVaul also had propranolol in their systems.

Based on the foregoing factual recitation, Judge Beacom issued a warrant authorizing the search of defendant's home and the seizure of, among other things, weapons, blood, fingerprints, bodily fluids, hair samples, fiber samples, drugs, written or pornographic material pertaining to homicides, papers tending to show the identity of any victims, homosexual literature, and certain clothing belonging to Nelson. Service of the warrant began around 6:30 p.m. on May 14.

### (2) *Second warrant*

On the evening of May 17, 1983, Sidebotham presented to Judge Beacom a telephonic affidavit for a further search warrant, incorporating the affidavits for the search of defendant's car and the prior search of his house. Sidebotham stated that, after completing his first search of the house, he learned there was relevant evidence at that location that he had not recovered. Specifically, four officers of various law enforcement agencies in the State of Oregon had described to Sidebotham unsolved murder cases in their respective jurisdictions, mentioning certain evidence Sidebotham had seen at defendant's house.

Officer James Reed of the Oregon State Police told Sidebotham about Michael O'Fallon, a young man whose body had been found on an on-ramp

to Interstate 5, a victim of ligature strangulation who had alcohol and diazepam in his system at the time of death. Missing from O'Fallon's possession was a pocket Kodak Instamatic camera with the initials "MJO" scratched onto the camera. Under the authority of the first warrant, Sidebotham had seized such a camera from defendant's house during the prior search. Reed also described to Sidebotham a certain backpack and other property O'Fallon had had with him before he died, as well as the clothing he was wearing. In conducting the first search of defendant's house, Sidebotham had seen boots, a T-shirt, corduroy pants and a leather belt matching the description of the clothing O'Fallon had been wearing when last seen. O'Fallon's body had been found on July 17, 1980, a date when defendant had been in Oregon on a business trip.

Detective William Kennedy of the Lane County Sheriff's Office, near Eugene, Oregon, had told Sidebotham that the dead body of Michael Duane Cluck had been found off Interstate 5 on April 10, 1981. Cluck had been bludgeoned to death, and alcohol and Valium were found in his system. Certain property and clothing Cluck had in his possession, including a pair of black men's roller skates with white wheels, were missing. Sidebotham had seen such a pair of skates in the master bedroom of defendant's house, as well as a backpack matching the description of the one owned by Cluck. Defendant had been working in the Portland area from March 1, 1981, through May 9, 1981.

Sergeant Will Heningston of the Marion County Sheriff's Office in Salem, Oregon, had told Sidebotham that the nude body of Anthony Silveira had been found near a rural road close to Interstate 5 on December 18, 1982. The cause of death was ligature strangulation and alcohol and diazepam were in Silveira's system at the time of death. Silveira had last been seen alive on December 3, 1982, and it appeared he had been dead approximately two weeks. Sidebotham had received a list of the clothing Silveira was wearing when last seen; while executing the first warrant to search defendant's house, Sidebotham had seen tennis shoes matching those worn by Silveira. Defendant had stayed at the Holiday Inn in Wilsonville, Oregon, from December 1 through December 3, 1982.

Detective Linda Estes of the Clackamas County Sheriff's Office in Oregon City, Oregon, had told Sidebotham that, on November 24, 1982, the dead body of Brian Whitcher had been found on a rural road in the Wilsonville area, clad only in jeans and a sweater. The cause of death could not be determined, but alcohol and diazepam had been found in Whitcher's system. On November 23, 1982, defendant had stayed at the Holiday Inn in Wilsonville, Oregon, about two miles from the location where Whitcher's

body was found. Detective Estes had examined photographs taken during the search of defendant's house on May 14 and had advised Sidebotham that they appeared to depict Whitcher's jacket hanging in defendant's garage.

One of the photographs seized from underneath the floor mat of defendant's car showed murder victim Robert Wyatt Loggins, Jr., lying on a couch that was seized from defendant's house on May 14. The photographs, in which Loggins appeared to be deceased, showed him both clothed and unclothed. An application of the luminol chemical process to the couch had indicated the presence of blood. When Loggins's body was found, certain items of property and clothing with which he had last been seen were missing.

Based on the foregoing factual recitation, Judge Beacom issued a second warrant authorizing a search for the property of Robert Wyatt Loggins, Jr., and of the Oregon victims named in the affidavit.

### (3) Third warrant

While inside defendant's house executing the second search warrant on May 18, 1983, Sidebotham sought a third warrant by telephonic affidavit. The third affidavit incorporated by reference the affidavits in support of the car search warrant and the two prior house search warrants. Sidebotham told Judge Beacom that, while serving the second search warrant, he had observed some blood he had not seen while serving the first warrant on the evening of May 14. Sidebotham also stated that, about half an hour before he made the telephonic affidavit, Detective Sergeant Larry French of Kent County, Michigan, had advised him that, on December 9, 1982, the dead bodies of Dennis Alt and Christopher Schoenborn were found together in Kent County. Both were victims of ligature strangulation, and both had alcohol and diazepam in their systems at the time of death. A pen, inscribed "Amway Grand Plaza Hotel, Grand Rapids," had been inserted into Schoenborn's urethra. The two victims had last been seen alive at that hotel. Defendant had stayed at that hotel from December 5 through December 8, 1982. Detective Sergeant French had described to Sidebotham certain property missing from Alt and Schoenborn. Sidebotham had seen a jacket labeled with the name "Chris Schoenborn," as described by French, inside defendant's garage.

Based on the foregoing factual recitation, Judge Beacom issued a third warrant authorizing a search of defendant's house for blood and for the missing property of Alt and Schoenborn.

### (4) Validity of warrants and seizures

Defendant first contends that none of the warrants for the search of his home were supported by probable cause. In part, his argument rests on his

claim, rejected above, that his arrest and the search of his car, which yielded evidence presented in the affidavit for the house search warrants, were invalid. In other part, defendant argues probable cause was lacking because law enforcement officers had no reason to believe Gambrel was ever in defendant's house, and the other murders of which defendant was suspected had occurred too long before the search to justify a belief that any evidence was still present in the house. Defendant, however, fails to acknowledge that one of the photographs found in his car depicted a man, apparently deceased, sitting on a couch; that another of the photographs depicted a man who was either dead, asleep or unconscious; and that others showed undressed men. Clearly, officers could reasonably believe the photographs might have been taken in defendant's home and that additional evidence of criminal activity might be found there. Contrary to defendant's implicit argument, a finding of probable cause did not require either independent evidence of the date of the photograph or independent confirmation that the couch depicted in the photograph was in fact located in defendant's home. And the fact that the front passenger seat of defendant's car was found to be saturated with blood that probably was not Gambrel's reasonably justified a belief that defendant was responsible for other crimes. Coupled with the photographs suggesting defendant might have engaged in criminal acts in his home, the presence in his car of blood of unknown origin further supported the warrant for the search of his house.

Defendant also contends the warrants authorizing the search of his house were overbroad and vague. The only specific example of the asserted vagueness defendant offers relates to the various shirts described therein. We see no vagueness in the descriptions of which defendant complains; for example, searching officers would have entertained no uncertainty as to whether a "blue plaid long sleeved flannel shirt" was encompassed within the warrant, even if more than one shirt fitting that description might be found on the premises. Given that officers had received information indicating each of the items specified in the warrants was associated with a particular victim, the charge of overbreadth must be rejected as well.

Defendant complains so many items were seized that were not specified in the warrants that the officers perforce conducted a general search. As discussed above (*ante*, at p. 1041), however, searching officers may seize items not listed in the warrant, provided such items are in plain view while the officers are lawfully in the location where they are searching and the incriminating character of the items is immediately apparent. (*Horton v. California, supra*, 496 U.S. at p. 136 [110 S.Ct. at p. 2307].) Defendant vaguely asserts, "It is not any single item that presents the problem, but the overall array of items taken and the failure to present any substantial reason

for seizing many items that highlights the overall legal problem." The assertion, lacking as it is in specificity, virtually defies review. Defendant observes that the burden is on the People to justify the seizure of items not seized under the warrants, but on appeal all presumptions favor the judgment. (*In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1133 [275 Cal.Rptr. 797, 800 P.2d 1227].) Defendant seems to suggest that searching officers must have probable cause to connect each item seized with a particular murder victim, and that every such item be precisely described in the warrant, but he cites no authority for such an exacting interpretation of the Fourth Amendment. In sum, all the items of any significance that defendant enumerates as having been seized outside the scope of the warrant and used against him at trial are of a character that searching officers would immediately have recognized as incriminating. To cite but one example, the seizure of shoelaces from defendant's garage and den closet was clearly proper under the plain view doctrine, given the significance of ligatures and the fact that victims were missing shoelaces in several of the murders charged to defendant.

### e. *Seizure of pharmacy records pursuant to subpoena duces tecum*

In connection with his challenge to the trial court's ruling on the motion to suppress, defendant contends the seizure of pharmacy records pursuant to a subpoena duces tecum violated his state constitutional right of privacy. As the Attorney General observes, however, in denying the suppression motion the trial court did not rule on the merits of defendant's challenge to the seizure of the pharmacy records. Rather, the court stated the proper procedure with respect to those records would be a motion to quash the subpoena, a motion defendant never made. Defendant, therefore, has waived the argument their seizure violated his privacy rights.

Were we to reach the merits of defendant's claim, we would find no error warranting reversal. Supposing for the sake of argument that defendant had a protected privacy interest in the records, it is not clear he was prejudiced by their seizure: The records themselves were not admitted into evidence, while actual drugs, found in defendant's house and car pursuant to the warrant searches, were admitted.

### f. *Search at defendant's former place of business*

Defendant challenges the May 26, 1983, search warrant for the business premises of Lear-Siegler, where he had worked from January 1980 through January 1983. The warrant directed the seizure of seven cardboard boxes with defendant's name written on them, the contents of those boxes,

nine business binders located atop the boxes, and any other material containing defendant's name. Investigator Sidebotham's affidavit in support of the warrant application incorporated the four earlier affidavits relating to the searches of defendant's car and house, and further stated that, on May 23, 1983, an anonymous informant had telephoned an investigator for the Orange County District Attorney's Office to say that defendant had a diary at Lear-Siegler's place of business. Sidebotham contacted the general manager, who confirmed defendant was employed there and had some property stored on the premises. A Lear-Siegler employee showed Sidebotham some cardboard boxes with defendant's name written on them, along with nine business binders on top of the boxes. On his own initiative, the employee had gone through the boxes and had found a black address-type book with defendant's name on it. Sidebotham placed significance on the fact that the Oregon and Michigan murders of which defendant was suspected had occurred during a period when defendant was engaged in work-related travel to those states. Sidebotham therefore suspected he might find business records linking defendant to both Orange County and out-of-state murders.

Defendant challenges the warrant for the search of Lear-Siegler's premises on the basis that the supporting affidavit relied on information gleaned from the searches of defendant's car and house, searches he contends were illegal and thus tainted the Lear-Siegler search. As discussed above, we have rejected defendant's claims that the earlier searches of his house and car were constitutionally invalid and therefore find no basis on which to invalidate the search at Lear-Siegler. Defendant also suggests, without citation to authority, that the magistrate could not properly issue a warrant to search for evidence of crimes committed in another state in the absence of a request from law enforcement authorities in that state. As the Attorney General observes, section 1524, subdivision (a) provides a search warrant may be issued, inter alia, "[w]hen the property was stolen or embezzled" and "[w]hen the property or things to be seized consist of any item or constitute any evidence that tends to show a felony has been committed, or tends to show that a particular person has committed a felony." The statute contains no language suggesting the things to be seized must relate to a crime committed within this state or that the initiative must come from elsewhere. Finally, we reject defendant's unsupported contention that the Lear-Siegler search was an unconstitutional general search, as the warrant clearly specified the items to be seized.

### 4. *Hearsay Objection to "Airplane Hill" Testimony*

Defendant contends the trial court erred in overruling his hearsay objection to testimony by William Smith, a longtime resident of Huntington

Beach, that the location where the body of "John Doe Huntington Beach" was found had formerly been known as "Airplane Hill." ("AIRPLANE HILL" was an entry on the list found in defendant's car.) Outside the presence of the jury, the prosecution offered to prove, through Smith's testimony, that, in the 1940's and 1950's, the area was so called because of a steep dip in the road that was capable of causing cars travelling at a certain minimum speed to become airborne. Around 1960 the road had been filled in to carry truck traffic.

On appeal, defendant renews his hearsay objection. As did the trial court, we conclude it lacks merit. Smith's testimony related not out-of-court statements by others, but rather an unofficial place name known to him through his own personal experience, and thus did not constitute hearsay. (Evid. Code, § 1200.) By logical extension of defendant's reasoning, any name of a person, place or thing would be inadmissible hearsay, including the testimony of his own witnesses regarding alternative sites for "Airplane Hill." He cites no authority for the proposition, however, and the contrary appears supported by long-standing precedent. (See *People v. Watson* (1913) 165 Cal. 645, 651-652 [133 P. 298].)

### 5. Denial of Motion for Jury View of Scene Where Victim Hall's Body Was Found

■ Defendant contends the trial court erred in denying his motion, pursuant to section 1119,[8] to transport the jury to the remote mountain area where the body of Mark Howard Hall was found. Defense counsel argued that viewing the scene was the only way by which the jury could appreciate both the difficulty of defendant's disposing of the body in that location and the dissimilarity of the method of the Hall murder to others with which defendant was charged. The trial court concluded the jury was sufficiently assisted to determine defendant's guilt or innocence of the charge by testimony of witnesses for both the prosecution and the defense about the various routes to the scene, together with the admission into evidence of a map and photographs of the area, and that a view would thus be superfluous. This

---

[8]At the time of defendant's trial, section 1119 provided: "When, in the opinion of the court, it is proper that the jury should view the place in which the offense is charged to have been committed, or in which any other material fact occurred, or any personal property which has been referred to in the evidence and cannot conveniently be brought into the courtroom, it may order the jury to be conducted in a body, in the custody of the sheriff, marshal or constable, as the case may be, to the place, or to such property, which must be shown to them by a person appointed by the court for that purpose; and the officer must be sworn to suffer no person to speak or communicate with the jury, nor to do so himself, on any subject connected with the trial, and to return them into court without unnecessary delay, or at a specified time." (Stats. 1951, ch. 1674, § 98, p. 3847.) A subsequent amendment to the statute (Stats. 1996, ch. 872, § 119) did not change its substance.

erroneous ruling, defendant argues, deprived him of his constitutional right to present a defense and undermined the reliability of the judgment of death imposed upon him.

Whether to permit the jury to view the scene of a crime falls within the court's discretion, reviewable for abuse. (*People v. Price, supra*, 1 Cal.4th at p. 422.) By that standard, we find no error in the trial court's ruling. The photographs admitted into evidence and the testimony of several witnesses made clear the remote and rugged nature of the terrain where Hall's body was found; the jury was thus enabled to draw its own inferences about the probability defendant was capable of committing the crime and the differ- · ences between this offense and the others with which defendant was charged. Defendant was not denied the right to present a defense. Nor has he demonstrated the trial court's ruling undermined the reliability of the death judgment that is mandated by the Eighth and Fourteenth Amendments to the federal Constitution.

B. *Issues of Evidentiary Sufficiency*

1. *Sufficiency of Evidence of Murder—Crisel, Inderbieten, Klingbeil, Keith, Young, Wiebe, "John Doe Huntington Beach," Moore*

Defendant contends that eight of his murder convictions, relating to the victims enumerated above, must be reversed for insufficiency of evidence. He argues that, apart from what he terms "speculative inferences" drawn from the list found in his car, modus operandi was the only evidence or theory of his guilt and, as such, could not support the verdicts.

In addressing a challenge to the sufficiency of the evidence supporting a conviction, the reviewing court must examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. (*People v. Johnson* (1980) 26 Cal.3d 557, 578 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].) The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence. (*People v. Reilly* (1970) 3 Cal.3d 421, 425 [90 Cal.Rptr. 417, 475 P.2d 649]; accord, *People v. Pensinger* (1991) 52 Cal.3d 1210, 1237 [278 Cal.Rptr. 640, 805 P.2d 899].) The same standard applies when the conviction rests primarily on circumstantial evidence. (*People v. Perez* (1992) 2 Cal.4th 1117, 1124 [9 Cal.Rptr.2d 577, 831 P.2d 1159].) Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of

which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. (*Ibid.*) " 'If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment. [Citation.]' " (*People v. Thomas* (1992) 2 Cal.4th 489, 514 [7 Cal.Rptr.2d 199, 828 P.2d 101].) Applying this standard, we explain why defendant's argument fails to persuade us reversal of any of the convictions is warranted.

### a. *Crisel*

■ In the context of this case, the jury could reasonably find defendant guilty of murdering Crisel based on such features of the crime as the similarity of the drugs found in Crisel's body—high levels of antihistamines, among other drugs—to those found in the body of Loggins, to whom strong evidence linked defendant, and the presence of a burn on Crisel's left nipple made by a car cigarette lighter, a feature also shared by the Hall murder, to which defendant was linked by fingerprint evidence, as well as the Inderbieten murder. A tablet containing some of the drugs found in Crisel was found in defendant's car, which he had owned at the time of Crisel's death. The prosecutor argued that Crisel was represented on defendant's list by the entry "MARINE DRUNK OVERNIGHT SHORTS," referring to the fact that Crisel, a Marine, was clothed only in shorts when found and to the length of time it was thought defendant had kept Crisel before disposing of his body. Crisel, moreover, fit the physical profile of most of defendant's victims, being a White male of average size, and, also like most of them, Crisel's body was dumped near a freeway.

### b. *Inderbieten*

■ In the context of this case, the jury could reasonably find defendant guilty of Inderbieten's murder based on the method by which the offense was committed and the way in which the killer disposed of the body. Alcohol and diazepam, as well as the barbiturate secobarbital, were found in Inderbieten's body. The cause of death was anoxia due to suffocation. A car cigarette lighter had burned Inderbieten's eyes and nipples (a feature shared by the Hall murder, to which defendant was connected by fingerprint evidence, and the Crisel murder). Ligature marks were found on Inderbieten's wrists. Inderbieten, like Hall, had been emasculated and, as in the DeVaul and "John Doe Huntington Beach" cases, anal swabs revealed the presence of semen. When found, Inderbieten's body was clad only in a pair of pants, partially pulled down, and his body bore road burns from being

dumped from a moving vehicle near a freeway not far from where several of defendant's other victims were found.

### c. *Klingbeil*

Based on the cause of death (acetaminophen overdose, with ligature strangulation as a contributing factor), the burning of a nipple by a cigarette lighter, the absence of one of Klingbeil's bootlaces, the ejection of the body from a moving vehicle onto Interstate 5, and the presence on defendant's list of an entry assertedly corresponding to Klingbeil ("HIKE OUT LB BOOTS," referring to the fact the victim was wearing boots and apparently had recently been in Long Beach), in the context of this case the jury reasonably could find defendant guilty of Klingbeil's murder. Klingbeil, moreover, fit the physical profile of defendant's typical victim, being a young White male of average size.

### d. *Keith*

Based on the cause of death (ligature strangulation), the presence of alcohol and benzodiazepine drugs (diazepam and flurazepam) in Keith's system at death, the presence of ligature marks on his wrists, the ejection of the body from a moving vehicle, and the presence on defendant's list of an entry apparently corresponding to Keith ("MARINE CARSON," referring to the victim's status as a United States Marine and the fact defendant apparently met him in Carson), in the context of this case the jury reasonably could find defendant guilty of Keith's murder.

### e. *Young*

Although the cause of Young's death (a stab wound to the heart) differed from that of defendant's other victims, in the context of this case the jury reasonably could find defendant guilty of Young's murder in light of certain details of the offense: Young's belt and one of his shoelaces were missing when his body was found, alcohol and diazepam were in his system at the time of death, he had a ligature mark on his right wrist, he had been partially emasculated, and his body had been ejected from a moving vehicle. Additionally, a hair consistent with defendant's was found on Young's pants, and an entry on defendant's list ("JAIL OUT," assertedly referring to the fact Young had been released from the Orange County jail hours before he was killed) corresponded to Young. Young, moreover, fit the physical profile of defendant's typical victim.

### f. *Wiebe*

Based on the method of killing and certain other details of the offense, in the context of this case the jury reasonably could find defendant

guilty of the murder of Wiebe. Specifically, the cause of Wiebe's death was ligature strangulation; his belt and shoes were missing when the body was found; a sock had been inserted in his rectum; his pants were undone at the top, and his penis was partially exposed; and his body was dumped at the Seventh Street on-ramp to the San Diego Freeway, near the spots where the bodies of Moore, Inderbieten and Church were found. (The evidence that defendant murdered Church was particularly strong, as a photograph of Church was found in defendant's car and Church's electric shaver was found in defendant's house after his arrest. The jury could consider the proximity of the location of the victims' bodies as evidence the same person killed all four men.) Additionally, although Wiebe had a low blood-alcohol level and no drugs in his system at the time of his death, unlike most of defendant's other victims, Wiebe was smaller and lighter than the others. Further, an entry on defendant's list ("7TH ST.") could reasonably be thought to correspond to Wiebe.

g. *"John Doe Huntington Beach"*

 This unidentified victim fit the physical profile of defendant's typical victim, being a young White male of about average size, the cause of death was suffocation, his wrists bore ligature marks, he had been emasculated and dumped from a moving vehicle, his shoes were missing, and there was no belt in his pants. This victim had a blood-alcohol level of 0.07 percent and assertedly was represented on defendant's list by the entry "AIRPLANE HILL"; the prosecutor presented evidence that the location where this victim's body was found had been known as Airplane Hill when defendant was growing up in the vicinity. Based on the foregoing evidence in the context of this case, the jury reasonably could conclude defendant murdered this victim.

h. *Moore*

 Based on the cause of death and certain other details of the offense in the context of this case, the jury reasonably could conclude defendant had murdered Moore. Specifically, Moore died as a result of ligature strangulation; his body had been dumped from a moving vehicle in the area of the Seventh Street off-ramp from the 405 and 605 Freeways, near where the bodies of Wiebe, Inderbieten and Church would later be found; a sock had been inserted into his rectum and one foot was bare, as with victim Wiebe and somewhat similar to victim Loggins, to whom defendant was linked by photographic evidence; and Moore assertedly was represented on defendant's list by the entry "EDM." (The victim's name was stenciled on his shorts.) Additionally, Moore fit the profile of defendant's typical victim, and he was a Marine.

We have no difficulty concluding that, despite variations among these offenses, which spanned almost seven years, the jury reasonably could find defendant guilty of the murder of Crisel, Inderbieten, Klingbeil, Keith, Young, Wiebe, "John Doe Huntington Beach," and Moore.

### 2. Sufficiency of Evidence—Loggins Homicide

Defendant contends the evidence was insufficient to support his conviction for the murder of Robert Wyatt Loggins, Jr., noting a coroner's investigator originally classified the death as due to an accidental overdose of drugs based on the lack of external trauma to the body. Defendant also argues that because the record lacks sufficient proof of criminal agency in Loggins's death, the list entry assertedly pertaining to Loggins ("MC HB TATTOO") should have been excluded.

Addressing the latter question first, we have no trouble concluding the corpus delicti rule was satisfied here. "In any criminal prosecution, the corpus delicti must be established by the prosecution independently from the extrajudicial statements, confessions or admissions of the defendant. [Citations.] The elements of the corpus delicti are (1) the injury, loss or harm, and (2) the criminal agency that has caused the injury, loss or harm. [Citation.] Proof of the corpus delicti need not be beyond a reasonable doubt; a slight or prima facie showing is sufficient. [Citation.]" (*People v. Diaz* (1992) 3 Cal.4th 495, 528-529 [11 Cal.Rptr.2d 353, 834 P.2d 1171].) The identity of the perpetrator is not an element of the corpus delicti. (*People v. Cobb* (1955) 45 Cal.2d 158, 161 [287 P.2d 752].) That Loggins's naked body was found beside a road in a trash bag with a rope around his ankles and wrists supplies at least a prima facie showing of criminal agency, inasmuch as the bodies of victims of accidental drug overdose typically would not be disposed of in such a fashion. The inference of criminal agency in connection with the death is therefore reasonable and supports admission into evidence of the list entry assertedly pertaining to Loggins.

The evidence as a whole, moreover, sufficed to prove defendant murdered Loggins, under the standard applied in connection with defendant's challenge to the sufficiency of the evidence to support eight of the other murder convictions. In addition to the evidence recited above, photographs of Loggins were found in defendant's car and in a briefcase located in defendant's house. In some of the photographs Loggins was partially clothed or naked, and one photograph depicted Loggins holding his penis. According to Loggins's father, however, Loggins was not homosexual (and thus, one could infer, would not voluntarily have posed for defendant). Loggins, who

had various tattoos, was a Marine and was last seen alive by some fellow Marines at the Huntington Beach pier; the prosecutor plausibly argued the entry "MC HB TATTOO" on defendant's list referred to Loggins. The jury could properly find defendant guilty of the first degree murder of Robert Wyatt Loggins, Jr.

### 3. Sufficiency of Evidence of Mayhem—Geoffrey Alan Nelson

Defendant argues his conviction of mayhem must be reversed because the crime of mayhem requires a live victim (see *People v. Jentry* (1977) 69 Cal.App.3d 615, 629 [138 Cal.Rptr. 250]) and the record lacks any evidence Nelson was alive when he was emasculated. We disagree with defendant's characterization of the record. Officer Donald Batchelder of the Los Angeles Police Department testified that, shortly after he discovered Nelson's body on the Euclid Street on-ramp to the Garden Grove Freeway while driving to work at 5:15 a.m. on February 12, 1983, he saw Nelson's foot move. Nelson's body was warm to the touch, although a responding Garden Grove police officer detected no pulse or respiration. Pathologist Robert Richards, reviewing the autopsy report of Dr. Fischer (who was deceased at the time of trial), which noted the bleeding caused by the severing of Nelson's penis and scrotum was "not that great," opined the emasculation "probably" occurred postmortem, although it might have happened "perimortem," or around the time of death.

Although the bleeding, in Dr. Richards's opinion, was "not that great" and "there [wa]sn't too much in the way of tissue response to the cutting," evidently there was *some* bleeding and *some* tissue response, lending support to Dr. Richards's testimony the emasculation could have occurred perimortem. The jury could reasonably find the elements of mayhem were present here. That a contrary conclusion might also be reasonable does not compel reversal of the conviction. (*People v. Thomas, supra,* 2 Cal.4th at p. 514.) Even were we to reverse the mayhem conviction, however, there could be no conceivable effect on the judgment, in light of the 16 murders of which defendant was convicted and the eight additional murders, evidence of which was presented during the penalty phase.

### 4. Sufficiency of Evidence to Support Sodomy Verdict and Special Circumstance Finding

Defendant contends the record contains insufficient evidence to support his conviction of sodomy and the related special circumstance pertaining to victim Inderbieten, in that proof is lacking of penetration and anal intercourse or that the victim was alive at the time of the alleged

sodomy. Defendant also contends the evidence failed to establish that the sodomy was not merely incidental to the murder. The invalidity of the special circumstance finding, he urges, undermines the integrity of the death judgment required by the Eighth and Fourteenth Amendments to the federal Constitution. Contrary to defendant's argument, we find in the record sufficient evidence to sustain the verdict and finding, and there would be no plausible basis for reversal of the judgment even were we to reach a different conclusion.

As described above (*ante,* at p. 1010), about 6:15 a.m. on November 18, 1978, a passing motorist saw Michael Joseph Inderbieten's dead body on a transition road from Seventh Street leading to the 405 and 605 Freeway on-ramps in Long Beach. A responding Long Beach police officer observed that the victim was wearing only a pair of pants, partially pulled down and exposing his buttocks. The cause of death was determined to be anoxia due to suffocation. The victim's scrotum and testicles had been removed, probably antemortem. The victim's anus appeared to be slightly dilated, but the pathologist detected no trauma to the rectum. Analysis of anal swabs taken at the autopsy revealed the presence of semen and spermatozoa containing type B blood activity. The semen could have come from someone who was either a nonsecretor or a type B secretor. The victim, a secretor, had type B blood; defendant is a nonsecretor.

Citing the lack of trauma to the rectum and the evidence the victim had type B blood, defendant argues the semen found on the anal swabs probably came from the victim. As the Attorney General observes, however, absent is any evidence the victim ejaculated around the time of death. On these facts, including the condition of the victim's clothing, the jury reasonably found defendant committed the sodomy of Inderbieten, and we will not disturb its finding on appeal.

Likewise, the record contains sufficient evidence to support the jury's implicit conclusion the victim was alive when defendant committed sodomy, as required for conviction. (*People v. Ramirez* (1990) 50 Cal.3d 1158, 1176 [270 Cal.Rptr. 286, 791 P.2d 965].) Defendant reasons that the pathologist's finding of no injury to the rectum, despite slight dilation of the anus, indicates any penetration must have occurred after death, with its concomitant relaxation of the sphincter muscles. The jury, however, may have inferred, as the Attorney General suggests, that the sodomy was committed before the emasculation and resultant bleeding. In any case, as in *People v. Ramirez,* "[a]lthough the prosecution's pathologist may not have been able to determine clinically whether penetration occurred shortly prior to death, at

death, or just after death, in the absence of any evidence suggesting that the victim's assailant intended to have sexual conduct with a corpse [citation], we believe that the jury could reasonably have inferred from the evidence that the assailant engaged in sexual conduct with the victim while [he] was still alive rather than after [he] was already dead. Under the applicable standard of review [citations], we conclude that a reasonable trier of fact could have found the essential elements of sodomy beyond a reasonable doubt." (*Id.* at pp. 1176-1177.)

Defendant further argues the evidence fails to establish the sodomy special-circumstance finding, in that it cannot be determined whether the sodomy occurred in the course of murder, or conversely whether the murder occurred in the course of sodomy. He observes that the prosecutor focused exclusively on a theory of deliberate and premeditated murder, and the jury was not given a felony-murder instruction. We conclude, however, the evidence sufficed to enable a reasonable trier of fact to find that defendant committed a deliberate and premeditated murder while engaged in the commission of sodomy, or, in other words, that the sodomy was not merely incidental to the murder. (See *People v. Green* (1980) 27 Cal.3d 1, 59-62 [164 Cal.Rptr. 1, 609 P.2d 468].) The pattern of offenses disclosed by the evidence in this case, into which the jury could reasonably find the Inderbieten murder fit, is one of gaining control of the victims by means of drugs and/or alcohol, followed by a killing together with some sort of sexual misconduct and/or mutilation—here, both—not apparently done incidentally or as an afterthought.[9]

Even if we agreed with defendant that reversal of the sodomy special circumstance finding were required, however, under the circumstances of this case such reversal would not compel reversal and retrial of penalty. Given that this jury convicted defendant of 16 counts of first degree murder and heard evidence, in the penalty phase, showing he committed eight additional murders, it is not reasonably possible the jury would have returned a more favorable verdict absent the sodomy special-circumstance finding. (*People v. Brown* (1988) 46 Cal.3d 432, 448 [250 Cal.Rptr. 604, 758 P.2d 1135].)

---

[9]In *People v. Kelly* (1992) 1 Cal.4th 495, 524-525 [3 Cal.Rptr.2d 677, 822 P.2d 385], we held that if the victim were alive at the time an attempt to perpetrate a felony sexual offense began, the felony-murder special circumstance would apply even if the victim died in the course of the attempt. Nevertheless, the jury in this case was not instructed on attempted sodomy as a basis for the special circumstance finding, and we do not rely on a theory of attempted sodomy in upholding the special circumstance finding.

C. *Instructional and Related Issues*

 1. *Modus Operandi Instructions Given and Refused; Alleged Prosecutorial Bad Faith*

 Defendant contends the trial court committed several errors in instructing the jury concerning modus operandi. First, as he did in his claim of error in the denial of his motion for severance, he urges there were insufficient distinctive marks common to the various homicides. Hence, he argues, the giving of any modus operandi instruction was unjustified. Second, he contends the special instruction on modus operandi given his jury was legally flawed and compels reversal of eight specified murder counts ("with ramifications that extend to the remainder of the charges"). Third, he claims reversible error in the trial court's refusal of his requested special instructions concerning the Hall and Loggins homicides. Finally, he contends the prosecutor in this case acted in bad faith and presented a false picture to the jury by relying on a modus operandi theory despite his alleged awareness that the modus operandi of some of the homicides resembled that of William Bonin and his confederates. (See *People v. Bonin* (1988) 46 Cal.3d 659 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People v. Bonin* (1989) 47 Cal.3d 808 [254 Cal.Rptr. 298, 765 P.2d 460].) Defendant's contentions lack merit.

 Defendant criticizes the special instruction given the jury as not setting up a single standard against which to assess all of the charged offenses. "No specific group of homicides," he argues, "was offered as determining the pattern of characteristics making up [defendant's] modus operandi." Defendant's premise, that modus operandi requires one single set of distinctive marks common to all charged counts, is unsupported by authority. Indeed, one of the cases on which he relies, *People v. Thornton* (1974) 11 Cal.3d 738 [114 Cal.Rptr. 467, 523 P.2d 267], analyzes the admissibility, on the question of identity, of evidence of several different sexual assaults charged to the defendant in that case in precisely the manner defendant insists is error in this case. That is, in *People v. Thornton* this court enumerated various unusual characteristics of the crimes and noted those shared by the charged offenses, but we did not, as defendant apparently would have us do, look for characteristics *not* so shared by a particular offense and thereby disqualify that offense from consideration on modus operandi. Indeed, we noted that the probative value of the evidence of one uncharged offense "[wa]s not significantly diminished by the presence of certain marks of *dissimilarity* between the uncharged and charged offenses." (*People v. Thornton, supra,* at p. 758, italics in original; see also *id.* at p. 759.) As the Attorney General points out, even though various victims in this case were killed under

different circumstances, certain unique circumstances nevertheless were common to two or more murders. We conclude that, given the commonality of certain features of the various offenses present in the record of this case, the task of determining the degree of distinctiveness and the number of such circumstances necessary to establish defendant's identity as the perpetrator of these offenses was a matter for the jury. Finding no error, therefore, in submission to the jury of the modus operandi theory, we likewise find no merit in defendant's related claim that the resulting judgment lacks the reliability required by the Eighth and Fourteenth Amendments to the federal Constitution.

Defendant further contends the trial court erred in refusing his special instruction relating to the modus operandi of the Hall count. There was no error: The requested instruction was plainly argumentative, singling out particular pieces of evidence for the jury's consideration without attempting to explain any principle of law. (See *People v. Wright* (1988) 45 Cal.3d 1126, 1137 [248 Cal.Rptr. 600, 755 P.2d 1049].) The same infirmity afflicted the requested special instruction pertaining to the Loggins count, which for the same reason was properly refused.

Defendant contends the prosecutor acted in bad faith in trying the present case largely on a modus operandi theory despite his asserted awareness that the method ascribed to defendant matched that employed by Bonin in the latter's numerous killings.[10] As the Attorney General correctly argues, however, the record in this case does not reveal the prosecutor's reasoning as to why the 16 charged murders were committed not by Bonin but by defendant. Defendant invites us to take judicial notice of the records in the *Bonin* cases, but he fails to explain how doing so would illuminate the prosecutor's thought processes in this case. In any event, for us effectively to augment this record with the records of the *Bonin* cases would be improper. (See *People v. Sakarias* (2000) 22 Cal.4th 596, 635-636 [94 Cal.Rptr.2d 17, 995 P.2d 152].) We therefore decline to consider the claim of prosecutorial bad faith in this proceeding. Defendant's citation to *Napue v. Illinois* (1959) 360 U.S. 264 [79 S.Ct. 1173, 3 L.Ed.2d 1217], in which the high court overturned a conviction obtained by the prosecution's knowing use of false evidence, is inapposite given the absence of any suggestion the prosecutor in this case engaged in such a practice. Likewise not on point are *Pyle v. Kansas* (1942) 317 U.S. 213 [63 S.Ct. 177, 87 L.Ed. 214], involving prosecutorial coercion of witnesses, and *Alcorta v. Texas* (1957) 355 U.S. 28 [78 S.Ct. 103, 2 L.Ed.2d 9], involving the prosecutor's failure to correct a witness's false testimony.

---

[10]The same prosecutor, Bryan Brown, tried both the *Bonin* and *Kraft* cases in Orange County.

### 2. Trial Court's Refusal to Give Requested Pinpoint Instructions Concerning Identity of Perpetrator

 Defendant contends the trial court erred in refusing his requested instructions on the identity of the killer with respect to the counts involving Keith, Loggins, Crotwell, "John Doe Huntington Beach," Klingbeil, Inderbieten, Wiebe, Moore, Crisel, Young, Nelson, DeVaul, and Gambrel, and with respect to the possibility of multiple killers with respect to the Hall and Loggins counts. We conclude the trial court acted within its discretion in refusing as argumentative the requested instructions. A defendant has the right, on request, to instructions that pinpoint the theory of the defense, not specific evidence as such. (*People v. Wright, supra*, 45 Cal.3d at p. 1137.) The trial court properly refused the requested instructions, which merely invited the jury to draw inferences favorable to him from selected items of evidence. (*People v. Mincey* (1992) 2 Cal.4th 408, 437 [6 Cal.Rptr.2d 822, 827 P.2d 388].) Contrary to defendant's argument, the jury was adequately instructed, by means of CALJIC Nos. 2.90 and 2.91, that it must determine the identity of the perpetrator of each charged offense. The trial court's refusal of defendant's requested pinpoint instructions, therefore, did not deprive him of due process.

### 3. Failure to Instruct on Aiding and Abetting, Accessory Liability, and Lesser Related Offenses

 Defendant argues that the trial court erred in refusing his request for jury instructions on principles of aiding and abetting, as pertinent to the Hall and Loggins murders. He contends further the trial court should have instructed the jury on aiding and abetting with respect to the Hughes, Young, Keith and Klingbeil murders despite the lack of a request below, suggesting his trial counsel's failure to request such instructions constituted ineffective assistance requiring reversal of those convictions. He also asserts the trial court erred in refusing his request for instructions on accessory liability. Finally, he contends that, had the jury been properly instructed as to aiding and abetting principles and the law of accessories, it should, additionally, have been instructed on intent to kill. Defendant's contentions lack merit.

The trial court must instruct on lesser offenses necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser. (*People v. Birks* (1998) 19 Cal.4th 108, 118 [77 Cal.Rptr.2d 848, 960 P.2d 1073].) On the other hand, if there is no proof, other than an unexplainable rejection of the prosecution's evidence, that the offense was less than that charged, such instructions shall not be given. (*People v. Wickersham* (1982) 32 Cal.3d 307, 323-324 [185 Cal.Rptr. 436, 650 P.2d

311].) Citing *People v. Schader* (1965) 62 Cal.2d 716, 731-732 [44 Cal.Rptr. 193, 401 P.2d 665], *People v. Burnham* (1986) 176 Cal.App.3d 1134, 1141-1143, 1151 [222 Cal.Rptr. 630], and *People v. Lemus* (1988) 203 Cal.App.3d 470, 477 [249 Cal.Rptr. 897], defendant contends that, to trigger the necessity of an instruction on aiding and abetting, this substantial evidence may be incredible and not of a character to inspire belief because the jury, not the trial court, is to determine the credibility of witnesses. Unlike in the cited cases, however, the record before us contains no evidence, as distinct from mere speculation, that any other person was involved in the killings charged to defendant. (See *People v. Wilson* (1992) 3 Cal.4th 926, 942 [13 Cal.Rptr.2d 259, 838 P.2d 1212] ["Speculation is an insufficient basis upon which to require the trial court to give an instruction on a lesser included offense."].) Defendant asserts his small size, relative to Hall and Loggins, made it unlikely he, acting alone, could have placed the bodies in the locations where they were found. He also notes that the prosecution relied, to prove guilt, on the list, which was prepared after the crimes it purportedly memorialized. These circumstances, however, simply do not amount to evidence of another's participation warranting aiding and abetting instructions, nor do they suggest defendant's participation was limited to rendering after-the-fact assistance. Accordingly, the trial court did not err in refusing the requested instructions.

For this reason, too, we reject defendant's contention that his convictions on the charges tried under the 1977 death penalty law (the Hughes, Young, Keith and Klingbeil offenses) are invalid for want of an instruction on aiding and abetting. Although it is true that death eligibility under the 1977 law required a defendant to have been personally present and to have personally participated in the killing, the record in this case lacks any evidence suggesting defendant merely aided or abetted another principal in the offenses or assisted after the fact. Likewise, the lack of such evidence means the absence of aider-abettor instructions cannot invalidate special circumstance findings requiring intent to kill for persons who did not commit the actual killing. (See *People v. Anderson* (1987) 43 Cal.3d 1104, 1138-1148 [240 Cal.Rptr. 585, 742 P.2d 1306].)

Defendant contends the trial court erred in refusing to instruct on accessory after the fact (§ 32) as a lesser related offense to murder in connection with those counts where the evidence showed some connection between defendant and the victim, but no evidence showed the degree of his involvement in the killing. We disagree: Even were there evidence supporting a theory of accessory liability, which the trial court properly found lacking, defendant was not entitled to instructions on lesser related offenses. (*People v. Birks, supra,* 19 Cal.4th at p. 136, retrospectively overruling *People v.*

*Geiger* (1984) 35 Cal.3d 510 [199 Cal.Rptr. 45, 674 P.2d 1303, 50 A.L.R.4th 1055].)

Finally, it should be clear from the foregoing discussion that, given the correctness, on this record, of the trial court's declining to instruct on principles of aider-abettor and accessory liability, defendant's related claims of ineffective assistance of counsel and constitutional error under the Eighth and Fourteenth Amendments to the federal Constitution and the rule of *Beck v. Alabama* (1980) 447 U.S. 625 [100 S.Ct. 2382, 65 L.Ed.2d 392] also must fail.

4. *Failure to Instruct on Additional Requirements of 1977 Death Penalty Law*

▪ Defendant contends, and the Attorney General agrees, the trial court erred in failing to instruct the jury, with respect to the Hughes, Young, Keith and Klingbeil murder charges, regarding the requirements of the multiple-murder special circumstance under 1977 death penalty law. Instead, the jury was instructed on the corresponding requirements of the 1978 death penalty law with CALJIC No. 8.81.3 (5th ed. 1988), as follows: "To find the special circumstance, referred to in these instructions as multiple murder convictions, is true, it must be proved: [¶] The defendant has in this case been convicted of at least one crime of murder of the first degree as to counts 6, 7, 8, 9, 11, 12, 13, 14, 16, 18 or 19 and one or more crimes of murder of the first or second degree." The trial court should have instructed the jury on the 1977 law's requirement that the defendant have been personally present during the commission of the act or acts causing death and, with the intent to cause death, physically aided or committed such acts. The omission, nevertheless, was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24 [87 S.Ct. 824, 828, 17 L.Ed.2d 705, 24 A.L.R.3d 1065]; see *People v. Johnson* (1993) 6 Cal.4th 1, 45-46 [23 Cal.Rptr.2d 593, 859 P.2d 673].) The jury effectively, albeit impliedly, determined each issue adversely to him by returning the verdicts and making the findings that it did under other, proper instructions.

5. *Failure to Instruct the Jury That an Aider and Abettor Must Intend to Kill or to Aid Another to Kill for Special Circumstance to Apply*

In another argument asserting reversible error as a consequence of the trial court's failure to instruct the jury on principles of aiding and abetting, defendant contends that, with respect to the Moore, "John Doe Huntington Beach," Wiebe, Hall, Hughes, Young, Keith, Klingbeil, Inderbieten and Loggins murders, the evidence suggested multiple perpetrators;

the trial court, he argues, therefore was required to instruct the jury on the need to find intent to kill or to aid another person to kill for special circumstances to apply to an aider-abettor of those murders. (*People v. Anderson, supra,* 43 Cal.3d at pp. 1138-1147.) Again, as explained above, the trial court did not err in concluding the record lacked evidence supporting an aiding and abetting theory. Consequently, the error claimed by defendant did not occur.

### 6. Refusal to Give Defendant's Pinpoint Instruction on Corpus Delicti

■ Defendant contends the trial court erred in refusing his request for a special instruction specifically advising the jury that, before it could rely on the so-called death list, exhibit No. 165, as evidence of any of the charged offenses, it must first find a corpus delicti for that offense. The trial court concluded the requested instruction improperly focused the jury's attention on a particular piece of evidence. The trial court did, however, give a different instruction the defense requested, one that told the jury "[i]n the present case, [the corpus delicti rule] applies to every statement of the defendant. [¶] If you find that any tape recorded, written, or oral statement made by the defendant is either an admission or a confession, you may not consider that statement at all to prove the elements of any of the crimes charged, unless you have first determined that there is a corpus delicti for that crime. [¶] In other words, you may not rely at all on any statement of the defendant's to establish the corpus delicti of any crime charged." The court also instructed the jury with CALJIC No. 2.72, setting forth the corpus delicti rule.

We conclude the trial court did not err in refusing to give the instruction specifically referring to the list. The instruction was, as the trial court reasoned, argumentative, in that it focused the jury's attention on a particular piece of evidence. (*People v. Wright, supra,* 45 Cal.3d at p. 1137.) Further, even if the ruling could be said to be erroneous, defendant suffered no prejudice, as the substance of the refused instruction was conveyed through the special instruction the trial court did give. The jury could have been under no misunderstanding regarding the use it could properly make of the list, and it is not reasonably probable defendant would have obtained a more favorable result had the requested instruction been given. (*People v. Watson, supra,* 46 Cal.2d at p. 836.)

### D. Jury Issues

### 1. Trial Court's Refusal to Augment Juror Fees

■ Defendant contends the trial court's denial of his motion for an order directing Orange County to pay jurors selected to serve in this case

fees exceeding the statutory minimum (former Pen. Code, § 1143, repealed by Stats. 1988, ch. 1245, § 44, p. 4155; see now Code Civ. Proc., § 215) denied him due process of law and a fair trial comporting with the heightened reliability requirement for death judgments pursuant to the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. The latter requirement, he argues, imposed on the trial court a duty to ensure a jury drawn from a fair cross-section of the community and not excluding those who would be subjected to financial hardship by being forced to sit during such a lengthy trial. Defendant observes that many prospective jurors were excused for financial hardship. He acknowledges we have held that excusals of potential jurors for financial hardship do not violate the fair cross-section requirement (*People v. Medina* (1995) 11 Cal.4th 694, 747 [47 Cal.Rptr.2d 165, 906 P.2d 2]) and that due process does not require augmentation of the statutory juror compensation (*People v. DeSantis* (1992) 2 Cal.4th 1198, 1215-1216 [9 Cal.Rptr.2d 628, 831 P.2d 1210]), but he contends his case is different due to the length and complexity of his trial.

Granted that the length of this trial (13 months from jury selection to penalty verdict) and number of victims (16 in the guilt phase, eight others in the penalty phase) distinguish defendant's case from other capital cases in which this claim has been raised, defendant nevertheless fails to persuade us a different outcome is required here. That is, he fails to demonstrate, empirically or logically, the constitutional significance of the marginal increase in the length and complexity of his trial over those in which we have previously rejected this claim. To the extent he is suggesting that unusual complexity of a case, per se, requires an increase in jury fees, he cites no supporting authority, and we are aware of none.

2. *Ineffective Assistance of Counsel in Failing to Request Removal of Juror Whose Brother-in-law Was a Friend of Victim Gambrel*

■ As discussed above, the body of Terry Lee Gambrel was found in defendant's car in the early morning hours of May 14, 1983, when the California Highway Patrol stopped defendant on suspicion of driving under the influence of alcohol. Gambrel had been expected the previous evening, but never arrived, at a housewarming party hosted by Marine Sergeant Ronald Phillips. Handwritten directions to Phillips's residence were found in Gambrel's wallet. The defense presented evidence that Gambrel smoked marijuana and used drugs; that he habitually carried a shoe box with him; and that the Marines were investigating him for drug use. In rebuttal, the prosecution presented the testimony of a Marine who was friendly with Gambrel and who had seen the contents of the shoe box: it contained sports gear, not drugs as the defense implied.

Following the prosecution's presentation of rebuttal evidence, Defense Counsel McDonald informed the court that a Mrs. Drake was the sister of Juror Jim L. Mrs. Drake's husband was Donald Drake, whom the prosecution had interviewed as a friend of Gambrel's in the Marine Corps. Mr. and Mrs. Drake had been living with Sergeant Phillips at the time of Gambrel's death (hence, Gambrel was expected, but never appeared, at their residence the night he was murdered). In a telephone conversation conducted in chambers via speakerphone, with counsel present, Mrs. Drake stated her husband had offered to assist the prosecution in order to clear Gambrel's name of the accusations of drug abuse leveled by the defense. Mrs. Drake said she had only learned a month into the trial that her brother was a juror, and she and her husband had never spoken with her brother about the case, knowing to do so was prohibited. The trial court instructed Mrs. Drake that she and her husband were not to discuss the matter with anyone else and that no one in her family was to visit with Juror L. during deliberations. At defense counsel McDonald's request, the court told Mrs. Drake not to discuss the matter even with her husband.

The trial court indicated it intended to discuss the matter with Juror L., but defense counsel McDonald said he did not wish L. questioned and would not seek his removal as a juror. Subsequently, McDonald stated he was "not interested in any further exploration of the issue," explaining in part: "I have reviewed Mr. L[.]'s transcript on voir dire and I have looked on my notes and whatnot on him and I believe the questions that were asked were answered in an honest fashion." McDonald added that, if the court decided to question L., he preferred that counsel not be present, as he did not want L. to think either side wanted him removed. The court instead proposed to question L. with both counsel present and advise him that counsel for both sides wished to retain him on the jury.

The following day, the trial court questioned L. in the presence of defendant and counsel. L. stated he had not discussed Donald Drake's relationship with Gambrel with the Drakes. L. did not believe his brother-in-law's relationship with Gambrel or his status as a potential witness would affect his decisionmaking in the case. Defense counsel did not seek to remove L. The prosecution did not call Drake as a witness.

 To secure reversal of a conviction for ineffective assistance of counsel, a defendant must establish that counsel's performance fell below an objective standard of reasonableness and that, to a reasonable probability, defendant would have obtained a more favorable result absent counsel's shortcomings. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-694 [104 S.Ct. 2052, 2064-2068, 80 L.Ed.2d 674].) If the record on appeal fails to

show why counsel acted or failed to act in the instance asserted to be ineffective, unless counsel was asked for an explanation and failed to provide one, or unless there simply could be no satisfactory explanation, the claim must be rejected on appeal. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266-268 [62 Cal.Rptr.2d 437, 933 P.2d 1134].) ▮ Here the record—reflecting that defense counsel reviewed his notes and L.'s voir dire—hints at the existence of some tactical reason for counsel's decision to retain L. At least, the record fails to eliminate that possibility. Accordingly, defendant's claim must fail for purposes of this appeal.

### E. *Penalty Phase Issues*

#### 1. *Refusal to Empanel New Jury for Penalty Phase*

▮ Defendant contends the judgment must be reversed because the trial court erred in denying his motion to empanel a second jury to determine penalty. He predicated his motion on the expert opinion of psychology professor Dr. Steven Penrod, who, as noted, had testified previously in connection with the severance motion. Penrod opined in essence that the jury, having already rendered its unanimous verdict on the 16 murder counts and 11 special circumstance allegations, would be less able than a newly selected jury to give defendant a fair trial on penalty.

Section 190.4, subdivision (c) provides in relevant part that "[i]f the trier of fact which convicted the defendant of a crime for which he may be subject to the death penalty was a jury, the same jury shall consider . . . the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn." More than mere speculation or the desire of counsel is needed to establish good cause. We review the trial court's ruling for abuse of discretion. (*People v. Lucas* (1995) 12 Cal.4th 415, 482-483 [48 Cal.Rptr.2d 525, 907 P.2d 373].) Defendant acknowledges we have found no abuse of discretion in previous cases raising this issue, but he contends his case is different owing to the existence of the death list and the sheer number of murders the jury was being asked to adjudicate.

We are unpersuaded the trial court abused its discretion in denying defendant's motion for a second jury. Defendant's supporting evidence, i.e., the testimony of Dr. Penrod, was general in nature, applicable to a greater or lesser degree in any capital case in which evidence of other crimes is admitted in the penalty phase, and so does not particularly demonstrate how defendant was prejudiced. As the trial court noted, a second jury would have learned of the circumstances of each of the murder charges of which

defendant had been convicted, as well as the Oregon and Michigan murders and the assault on Joseph F., and would have come to its own conclusions about defendant's propensity to commit violent offenses. The Legislature has clearly articulated its preference for a single jury to decide both guilt and penalty (*People v. Fauber* (1992) 2 Cal.4th 792, 845 [9 Cal.Rptr.2d 24, 831 P.2d 249]), and, provided the chosen procedure satisfies basic principles of fairness, we are aware of no rule requiring the Legislature to select the process psychologically designed to render jurors most favorably disposed toward a defendant.

### 2. Evidentiary Issues

#### a. Admission of evidence concerning Joseph F. incident

 Defendant contends the trial court erred in admitting evidence that he had committed sexual offenses against Joseph F. in 1970, when Joseph was 13 years old. The evidence was unreliable, defendant argues, due to its age, the fact no criminal charge was ever brought and no statements made to the police at the time of the incident were preserved, and in light of Joseph F.'s request that authorities provide him sums of money in connection with his testimony against defendant. We conclude the trial court acted within its discretion in admitting the evidence.

Section 190.3, factor (b) provides for the admission, during the penalty phase of a capital trial, of evidence of any criminal activity by the defendant involving the use or attempted use of force or violence. The incident related by Joseph F. fit this definition: Defendant, Joseph testified, gave him drugs that negated his ability to resist, then sodomized him. As this evidence clearly fell within section 190.3, factor (b), the trial court had but limited discretion whether to admit it, such discretion going only to the manner in which the evidence was presented. (*People v. Bacigalupo* (1991) 1 Cal.4th 103, 140 [2 Cal.Rptr.2d 335, 820 P.2d 559]; *People v. Karis* (1988) 46 Cal.3d 612, 641 [250 Cal.Rptr. 659, 758 P.2d 1189].) Defendant complains the remoteness in time of the incident deprived the evidence of reliability, but we have held remoteness affects the weight, not the admissibility, of such evidence. (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1161 [36 Cal.Rptr.2d 235, 885 P.2d 1].) Defendant argues he was unable to defend against the evidence. The record, however, reflects that trial counsel vigorously attacked Joseph F.'s credibility, presenting evidence that Joseph's mother had told school personnel her son was a pathological liar, that Joseph had never told his parents he was sexually assaulted, and that Joseph had suffered various criminal convictions and had asked law enforcement authorities for $500 to get his car repaired and later for a $1,000 loan, although

he did not, in the end, receive money for his testimony. Moreover, the jury was instructed not to consider the offenses against Joseph F. unless it found beyond a reasonable doubt defendant had committed them.

In any event, even if the trial court had erred in admitting Joseph F.'s testimony, there is no reasonable possibility defendant would have obtained a more favorable verdict absent the error, given that the jury had found defendant guilty of 16 murders and heard compelling evidence of eight additional murders during the penalty phase. (See *People v. Roberts* (1992) 2 Cal.4th 271, 327 [6 Cal.Rptr.2d 276, 826 P.2d 274].)

 b. *Admission of expanded version of redacted list*

 As discussed in the statement of penalty phase facts above, the prosecution, in its case in aggravation, presented evidence that defendant had murdered six men in Oregon and two in Michigan. The prosecution then sought to present evidence that the list found in defendant's car contained seven entries referring to these eight victims, in addition to the entries previously admitted during the guilt phase. The prosecution asserted that "GR 2" referred to the two victims from Grand Rapids, Michigan; "PORTLAND HAWAII" referred to Lance Taggs, who grew up in Hawaii and who, when last seen, was wearing a shirt with "Hawaii" printed on it and carrying a State of Hawaii identification card; "PORTLAND DENVER" referred to Michael O'Fallon, who was from the area near Denver, Colorado; "PORTLAND BLOOD" referred to Michael Duane Cluck, whose body was covered in blood when it was found; "PORTLAND RESERVE" referred to Anthony Silveira, who was a member of the National Guard and whose army jacket defendant took from him; "PORTLAND HEAD" referred to Brian Whitcher, who liked to smoke marijuana; and "PORTLAND ELK" (or "ECK"), by process of elimination, evidently referred to "John Doe Oregon."

The defense objected to admission of the additional entries, citing the same grounds as those on which they sought exclusion of the entries relevant to the guilt phase offenses, i.e., that the entries lacked relevance, constituted hearsay, and supported only speculative inferences. The court overruled the defense objection and permitted the prosecution to introduce the additional entries, which were graphically presented to the jury as a second column to the original entries. The court observed it would permit the prosecutor to introduce the entire unredacted list if the defense preferred it over the redacted list, an option the defense declined.

Defendant now reiterates his contention that the trial court erred in admitting the expanded version of the list, renewing the arguments we have

previously rejected (see *ante*, at pp. 1032-1036). For the reasons articulated above, we conclude the trial court did not abuse its discretion in admitting the additional list entries in the penalty phase. Defendant argues that he suffered additional prejudice in the penalty phase as a result of the admission of the expanded list, in that the jury had, by then, already decided the list was a death list. Moreover, he argues, the prosecutor's presentation implied there were exactly seven entries on the list in addition to those the jury had already seen and, thus, that there existed a perfect fit between the list and the other evidence of the penalty phase offenses. The jury's guilt verdicts, however, did not necessarily establish that it believed the list signified defendant's victims, and the appearance of a "perfect fit" resulted from defendant's election not to permit the unredacted list. Defendant contends the prosecutor's questioning of his investigator implied there were only seven additional entries on the list.[11] Contrary to defendant, we do not believe the jury necessarily would have inferred, from the prosecutor's use of the word "finally," that the additional entries exhausted the list; more likely the jury simply understood the word as signalling the end of that line of questioning.

 c. *Exclusion of rabbi's testimony regarding position of Jewish religion on capital punishment*

██ The defense called Rabbi Leonard Beerman as a character witness during the penalty phase. Rabbi Beerman testified he had met and spoken with defendant and his family and that he was struck by defendant's intelligence and sensitivity and the gentleness of his personality. He believed defendant was innocent of the crimes of which he was convicted and should not suffer the death penalty. The rabbi explained further that he believed no one, including Hitler and Eichmann, should be executed. When defense counsel asked how the rabbi reconciled his testimony that defendant should not be executed with "existing or perceived existing tenets of Judaism," the trial court sustained the prosecutor's objection on grounds of relevancy.

---

[11]The prosecutor examined the investigator as follows: "Q. Now, in that respect, did you have occasion to observe the contents of a business notebook that was found in Mr. Kraft's trunk? [¶] A. Yes, I did. [¶] Q. And on a paper in that business notebook did you see a number of entries on—from a list? [¶] A. Yes, I did. [¶] Q. And during the guilt phase, did you—of this trial—did you cause a number of those entries on that list to be produced in the form of a display that could be used to display to the jury? [¶] A. Yes, I did. [¶] Q. Were there other entries on that list in addition to the ones that you had put on display? [¶] A. Yes. [¶] Q. Specifically, was there an entry that was represented as or depicted as GR2? [¶] A. Yes, there was. [¶] Q. Was there an entry Portland Hawaii? [¶] A. Yes. [¶] Q. Was there an entry Portland Blood? [¶] A. Yes. [¶] Q. Was there an entry Portland Denver? [¶] A. Yes. [¶] Q. Was there an entry Portland Reserve? [¶] A. Yes. [¶] Q. Was there an entry entitled Portland Head? [¶] A. Yes. [¶] Q. And finally was there also an entry entitled Portland Elk? [¶] A. Yes."

Rabbi Beerman went on to testify, nonetheless, that he believed "the death penalty is a violation of God's law and my Jewish faith is something that confirms me in this conviction."

Defendant contends the trial court's ruling deprived him of his statutory and constitutional rights to present mitigating evidence. He observes that the federal Constitution precludes a state from imposing procedural barriers to the sentencing jury's consideration of mitigating evidence (e.g., *Mills v. Maryland* (1988) 486 U.S. 367, 375 [108 S.Ct. 1860, 1865, 100 L.Ed.2d 384]; *Skipper v. South Carolina* (1986) 476 U.S. 1, 4 [106 S.Ct. 1669, 1670-1671, 90 L.Ed.2d 1]; *Lockett v. Ohio* (1978) 438 U.S. 586, 604 [98 S.Ct. 2954, 2964, 57 L.Ed.2d 973]) and notes California's "catchall" mitigating factor broadly permits a defendant to present evidence of "any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime" (§ 190.3, factor (k)). Defendant primarily asserts the evidence he sought to present was relevant to Rabbi Beerman's credibility because his views were made by some unspecified means to appear out of the mainstream of Jewish thinking. (Cf. *People v. Mickle* (1991) 54 Cal.3d 140, 196 [284 Cal.Rptr. 511, 814 P.2d 290] [questions seeking to elicit a partisan expert's philosophical views on capital punishment might disclose some bias bearing on the expert's credibility as a witness in the penalty phase].) Assuming the trial court erred in sustaining the prosecutor's relevancy objection, however, defendant suffered no prejudice. After testifying to his belief defendant should not be executed, the rabbi stated his Jewish faith confirmed him in the conviction that capital punishment is a violation of God's law. The jury therefore could infer that Judaism disapproves of the death penalty, and to have explored the question further would not particularly have assisted the jury. We see no reasonable possibility the jury would have returned a more favorable verdict had the rabbi been permitted to testify more fully concerning Judaism's attitude toward the death penalty. (*People v. Brown, supra*, 46 Cal.3d at pp. 446-448.)

d. *Exclusion of defendant's postarrest writings*

 Through the testimony of defense investigator Ramsay, the defense sought to have admitted into evidence letters written by defendant to others during his incarceration in the Orange County jail pending his trial. Jail authorities had intercepted and copied the letters and then disclosed them to the defense during discovery. The prosecution objected to the admission of the letters on grounds of hearsay, and the trial court questioned their relevancy as well. The defense asserted the letters were not hearsay, in that they were offered not for the truth of the matters asserted therein but to show

the defendant "as a human being and a concern he has for other people and the concern for the welfare and sensitivity to other people's problems and issues." The prosecution characterized the letters as essentially "telling all of his friends that he didn't do it"; the defense contended the letters stood for more than that. The trial court viewed the letters as "one hundred percent self-serving hearsay" and found them unreliable, possibly having been written for presentation in the penalty phase. Accordingly, the court sustained the prosecutor's objection, but ruled the defense could introduce any poetry or drawings defendant had produced.

We conclude the trial court did not abuse its discretion in so ruling. The letters were indeed hearsay, in that they possessed no probative value apart from the truth or sincerity of their contents. The trial court also reasonably could have entertained questions regarding their reliability, given the circumstances in which they were composed. In *People v. Harris* (1984) 36 Cal.3d 36, 70 [201 Cal.Rptr. 782, 679 P.2d 433], this court concluded the proponent of penalty phase evidence, consisting of poetry composed by the defendant, had the burden of showing it was reliable or trustworthy. We noted the defendant in that case had previously written poetry and the poems he sought to introduce had been seized when he was extradited to Kansas (and thus evidently had not been disseminated to potential witnesses). Comparable circumstances were not shown to exist in the present case. Indeed, the record contains a suggestion that defendant, during his pretrial incarceration, was concerned to assemble a persuasive case in mitigation: A jail correctional officer testified that, in a conversation with defendant about his planning for the penalty phase of his trial, defendant complained about a write-up he had received for an infraction of jail rules.

Even were the ruling erroneous, however, we have no difficulty finding beyond a reasonable doubt defendant suffered no prejudice, as numerous witnesses testified defendant was a caring, sensitive individual.

 e. *Admission of evidence of "John Doe Oregon" homicide; related modus operandi instructions*

■ Defendant contends the jury could not properly consider the "John Doe Oregon" homicide in its assessment of penalty because the evidence was insufficient to support the conclusion that defendant murdered this victim. Defendant further contends the modus operandi theory was not properly available because the evidence was insufficiently distinctive, and the related instructions therefore should not have been given.

Finally, because the jury could not properly consider this evidence, defendant contends he is entitled to a reversal and retrial of penalty. We disagree.

We conclude the evidence presented in the penalty phase sufficed to show that defendant murdered "John Doe Oregon." Placing the facts in context, one will recall the strong evidence demonstrating that defendant murdered Michael O'Fallon: The nude body of O'Fallon, who had hitchhiked from suburban Denver, Colorado, was found off Interstate 5 about 10 miles south of Salem, Oregon, on July 17, 1980. He had asphyxiated due to ligature strangulation; his ankles and wrists were bound with shoelaces. O'Fallon's blood contained alcohol (0.04 percent) and diazepam. O'Fallon's camera was seized from defendant's garage. Defendant was visiting Oregon on business with the Peerless Division of Lear-Siegler between July 16 and July 18, 1980; during that period he drove a rental car a distance of 993 miles although Peerless's place of business was only 25 miles from the Portland airport. The list found in defendant's car contained the entry "PORTLAND DENVER."

The day after O'Fallon's body was discovered, authorities discovered the body of "John Doe Oregon," also near the side of Interstate 5, one mile south of Woodburn, Oregon, "fairly close" to the location where O'Fallon's body was found. The victim was a White male, 35 to 40 years old, who had asphyxiated due to ligature strangulation. The victim's blood contained alcohol (0.06 percent) and diazepam. The victim's bootlaces and belt were missing; the victim was never identified. Defendant's list contained the entry "PORTLAND ELK"; the prosecutor argued, evidently by process of elimination from the remaining "PORTLAND" entries, that this entry referred to "John Doe Oregon."

Defendant's presence in the general area at the time "John Doe Oregon" was killed, as well as a method of killing (ligature strangulation following the victim's ingestion of alcohol and diazepam, and the absence of the victim's belt and bootlaces) so similar to that involved in a number of defendant's other murders, strongly support an inference that defendant murdered "John Doe Oregon." It follows that the trial court did not err in submitting the facts of this offense to the jury under a modus operandi instruction essentially identical to that given in the guilt phase, which we held above (*ante*, at pp. 1061-1062) to be a correct statement of the law.

### 3. *Asserted Invalidity of Sodomy Special Circumstance Finding*

"Extending" his related argument from the guilt phase (*ante*, at p. 1060), defendant contends the assertedly invalid sodomy special circumstance, relating to the murder of Michael Inderbieten, was improperly introduced into the penalty phase and necessitates reversal and retrial of penalty. Consistent with our related conclusion from the guilt phase upholding the sodomy special circumstance finding, we disagree. Even were our conclusion otherwise, given the magnitude of defendant's crimes there is no reasonable possibility of a more favorable penalty verdict had the jury not considered the sodomy special circumstance. (*People v. Roberts, supra,* 2 Cal.4th at p. 327.)

### 4. *Alleged Prosecutorial Misconduct*

 Defendant contends the prosecutor engaged in misconduct by improperly "turning a mitigating factor into an aggravating factor." Specifically, he urges that the prosecutor exhorted the jury to use the factor of sympathy in aggravation. In discussing section 190.3, factor (k), the prosecutor argued during his summation: "Now, how much sympathy does Mr. Kraft deserve? Has Mr. Kraft shown sympathy along the line? On any of these prolonged killings, did Mr. Kraft show sympathy, compassion, pity? Did he show any at all with respect to Terry Gambrel?" The prosecutor further urged the jury, in examining the photo album of defendant's life prepared by the defense investigator, to compare the dates of pictures to the dates of defendant's killings. The prosecutor suggested: "And as you go through his picture life that Mrs. Ramsay made, go through his, his life of killing and maiming, integrate the two and then ask yourselves how much sympathy, compassion and pity does Mr. Kraft deserve from you?" Defendant contends that, because factor (k) can only be a mitigating factor (*People v. Whitt* (1990) 51 Cal.3d 620, 654 [274 Cal.Rptr. 252, 798 P.2d 849]), the prosecutor's argument asking the jury to disregard sympathy for defendant and to aggravate the sentence because defendant showed no sympathy for his victims constituted misconduct.

The point is waived for lack of a contemporaneous objection. (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1215-1216 [275 Cal.Rptr. 729, 800 P.2d 1159].) Although defendant contends an objection would have been futile, we disagree: No reason appears why an admonition by the trial court would not have cured any error. (*People v. Green, supra,* 27 Cal.3d at p. 29.) In any event, the prosecutor's remarks constituted appropriate comment on the

evidence. The prosecutor merely responded to defense argument urging sympathy for defendant and sought to negate its mitigating effect by highlighting defendant's apparent lack of concern for the murder victims. (See *People v. Bemore* (2000) 22 Cal.4th 809, 855 [94 Cal.Rptr.2d 840, 996 P.2d 1152].) Even had the argument exceeded the bounds of propriety, on the record of this case it is inconceivable defendant would have suffered any prejudice. For these reasons, trial counsel's failure to object did not amount to ineffective assistance.

### 5. *Failure to Instruct on Burden of Proof of Existence of Mitigating Factors*

The defense requested a special instruction that would have told the jury: "A mitigating circumstance need not be proved beyond a reasonable doubt to exist." Although the prosecution did not object, the trial court declined to give the requested instruction, reasoning it could be misinterpreted to require *all aggravating* circumstances to be proven beyond a reasonable doubt, when some (for example, the defendant's age) need not meet such a standard. The trial court instead instructed the jury: "You may also consider, take into account, and be guided by the following factors in mitigation if you find them to be true . . . ." and proceeded to enumerate various factors. Defendant contends the trial court erred in refusing his requested instruction and in failing sua sponte to give an accurate instruction on the burden of proof or persuasion as to mitigating circumstances, which would have entailed instructing the jury as to the substantial evidence standard (see *People v. Wharton* (1991) 53 Cal.3d 522, 600-601 [280 Cal.Rptr. 631, 809 P.2d 290]).

We rejected a similar contention in *People v. Welch* (1999) 20 Cal.4th 701, 767 [85 Cal.Rptr.2d 203, 976 P.2d 754], finding no reason to believe that a jury, given instructions that aggravating factors must be proven beyond a reasonable doubt, but told nothing about mitigating factors, would think it could consider mitigating circumstances only if proven beyond a reasonable doubt. Likewise, we find no reason on the record of this case to believe the jury misunderstood its ability to consider mitigating evidence.

### 6. *Reliability of Defendant's Conviction and Sentence*

Alluding to various asserted errors in his trial, under the rubric of the Fifth, Eighth, and Fourteenth Amendments to the federal Constitution, defendant contends his conviction and sentence lack the "heightened level of

reliability" required of death judgments. His briefing on this point raises no arguments or authority not previously asserted and thus fails to cast doubt on the judgment.

### 7. *Constitutionality of Death Penalty Law*

Defendant mounts a number of challenges to the constitutionality of California's death penalty law, both facially and as applied to him. We have addressed all his facial challenges in previous cases; none have merit. Specifically, section 190.2 adequately performs the narrowing function mandated by the Eighth Amendment to the federal Constitution, as construed in *Zant v. Stephens* (1983) 462 U.S. 862, 877 [103 S.Ct. 2733, 2742, 77 L.Ed.2d 235]. (*People v. Crittenden* (1994) 9 Cal.4th 83, 155-156 [36 Cal.Rptr.2d 474, 885 P.2d 887]; *People v. Bacigalupo* (1993) 6 Cal.4th 457, 467 [24 Cal.Rptr.2d 808, 862 P.2d 808].) In particular, the felony-murder special circumstance is not overbroad despite the number of different possible predicate felonies and the lack of a requirement that the killer have had the intent to kill. (*People v. Marshall* (1990) 50 Cal.3d 907, 946 [269 Cal.Rptr. 269, 790 P.2d 676]; *Tison v. Arizona* (1987) 481 U.S. 137, 158 [107 S.Ct. 1676, 1688, 95 L.Ed.2d 127].) The scope of prosecutorial discretion whether to seek the death penalty in a given case does not render the law constitutionally invalid. (*People v. Crittenden, supra,* at p. 152.) The law is not unconstitutional for failing to require proof beyond a reasonable doubt of aggravating factors, in support of a finding that aggravation outweighs mitigation, or that death is the appropriate penalty. (*People v. Memro* (1995) 11 Cal.4th 786, 886 [47 Cal.Rptr.2d 219, 905 P.2d 1305].) Nor is the law constitutionally infirm because it does not require intercase or intracase proportionality review. (*People v. Arias* (1996) 13 Cal.4th 92, 192-193 [51 Cal.Rptr.2d 770, 913 P.2d 980].) Section 190.3, factor (a) ("circumstances of the crime") is not unconstitutionally vague. (*Tuilaepa v. California* (1994) 512 U.S. 967, 976 [114 S.Ct. 2630, 2637, 129 L.Ed.2d 750].) Written findings concerning aggravating factors the jury has found to be true are not constitutionally required. (*People v. Memro, supra,* at pp. 886-887.) Prosecutorial reliance on unadjudicated criminal activity during the penalty phase does not render a defendant's sentence unreliable. (*People v. Hawthorne* (1992) 4 Cal.4th 43, 76 [14 Cal.Rptr.2d 133, 841 P.2d 118].) The use of the word "extreme" in section 190.3, factor (d) ("extreme mental or emotional disturbance") does not preclude consideration of mitigating evidence in violation of the Constitution. (*People v. Memro, supra,* at p. 887.) The trial court was not constitutionally required to inform the jury that certain sentencing factors are relevant only in mitigation, and the statutory instruction to the jury to consider "whether or not" certain mitigating factors were

present did not unconstitutionally suggest that the absence of such factors amounted to aggravation. (*Ibid.*) Indeed, in the present case the trial court expressly instructed the jury it should not consider the absence of any mitigating factor as a factor in aggravation.

## III. DISPOSITION

The judgment is affirmed.

George, C. J., Mosk, J., Kennard, J., Baxter, J., Chin, J., and Brown, J., concurred.

Appellant's petition for a rehearing was denied October 18, 2000.